United States Court of Appeals,

Fifth Circuit.

No. 95-10688.

CLARDY MANUFACTURING COMPANY, Plaintiff-Appellee/Cross-Appellant,

v.

MARINE MIDLAND BUSINESS LOANS INC, Defendant-Appellant/Cross-Appellee,

and

Jim L. Ely, Movant.

July 22, 1996.

Appeal from the United States District Court for the Northern District of Texas.

Before WISDOM, EMILIO M. GARZA and PARKER, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Plaintiff Clardy Manufacturing Company ("Clardy Manufacturing") sued Marine Midland Business Loans, Inc. ("Marine"), alleging that Marine breached its commitment to lend under a satisfaction contract. Following a bench trial, the district court concluded that Marine had obligated itself to make a loan to Clardy Manufacturing under the satisfaction contract once certain creditworthiness criteria had been satisfied and awarded damages in favor of Clardy Manufacturing. Marine now appeals. Clardy Manufacturing cross-appeals the district court's denial of its claim under the Texas Deceptive Trade Practices Act ("DTPA") and the district court's failure to consider its alternative common law claims for fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel. Concluding that there

1

was no satisfaction contract obligating Marine to make a loan, and that Clardy Manufacturing's remaining claims fail as a matter of law, we reverse in part, affirm in part, and render judgment in favor of Marine.

I

Clardy Manufacturing Company is a family owned business that makes and sells after-market air conditioners for automobiles. In 1989, John Clardy, Jr., began looking for new financing for the company, primarily in order to purchase the shares of the company's retiring founder, his father John Clardy, Sr., and thereby take over ownership of the company. The company also needed financing in order to effect a merger with Premier Parts, Inc.,[1] to refinance its existing debt, and to obtain additional working capital.[2] Clardy Manufacturing unsuccessfully sought financing from at least six different lenders. The company was eventually referred to Marine, an asset-based lender with an office in Dallas, Texas. In contrast to a commercial bank, which primarily makes loans based on a company's cash flow, an asset-based lender like Marine makes loans on the basis of a company's collateral.

In the middle of 1990, Clardy Manufacturing discussed a potential loan with Michael Norvet, the senior business development officer for Marine's Dallas office. After Clardy Manufacturing

---

[1]Premier Air Parts, Inc., which was also in the after-market air conditioner business, sold air conditioner parts to customers of Clardy Manufacturing and its competitors.

[2]On sales of nearly $16 million in 1989, the company suffered a loss of $663,000.

submitted some preliminary financial information, Norvet informed the company that it did not meet Marine's minimum loan requirements. Discussions resumed, however, in the fall of 1991, after Marine reduced its minimum loan requirements from $5 million to $3 million. Clardy Manufacturing had not yet been able to secure financing, and John Clardy, Jr., and Norvet discussed the possibility of a $4 million loan. John Clardy, Jr., provided Norvet with additional financial information about the company, and he also completed Marine's pre-loan questionnaire and submitted the required financial projections.

In early January 1992, representatives from Clardy Manufacturing and Marine met in Dallas to discuss the loan application. John Clardy, Jr., arrived with Richard Berman, the President of Premier Air Parts. Norvet introduced the two men to Jim Ely, Marine's senior regional manager of the Dallas office, and Frank Mederos, Marine's national marketing director. There was conflicting evidence presented at trial regarding what exactly the Marine representatives told John Clardy, Jr., and Berman regarding Marine's credit approval process. Nevertheless, the parties agree that at the close of the meeting, Mederos authorized the issuance of a proposal letter, which would permit Marine to proceed further in evaluating Clardy Manufacturing's loan application. Accordingly, at another meeting ten days later, a proposal letter, or letter agreement, was signed by John Clardy, Jr., and Norvet. Clardy Manufacturing argues that this letter constituted a "satisfaction contract," while Marine, on the other hand, contends

that it was merely an agreement to undertake due diligence.

Marine proceeded to conduct due diligence aimed at evaluating the financial health of Clardy Manufacturing, as well as the company's collateral that would form the basis for the $4 million loan. As part of this effort, Marine had appraisals made of Clardy Manufacturing's real property, inventory, and equipment. Marine's auditors also conducted a field examination of Clardy Manufacturing's books and records. In April of 1992, the resulting due diligence information was analyzed by David Boyd, the senior officer at Marine's Dallas office. Boyd's responsibility was to generate the "PCREF," Marine's computer generated, credit evaluation form. Based on the computer analysis, Boyd concluded that Clardy Manufacturing did not meet all of Marine's credit approval requirements, and as a consequence the loan application would have to go through an additional level of home office approval. Nevertheless, Boyd, who did not have any credit approval authority, recommended that the loan be approved.

Clardy Manufacturing's loan application and the PCREF results were then reviewed by Kurt Putkonen, who was administrative vice-president and territory manager for Marine. Putkonen also had no credit approval authority. After making an independent evaluation of the loan documents, Putkonen decided not to recommend to the home office that Clardy Manufacturing's loan application be approved,[3] and in the middle of June 1992, Norvet communicated to

---

[3]Putkonen explained at trial that he had been concerned about the company's history of losses during the previous three years, that the company was significantly behind in its current year plan,

4

John Clardy, Jr., that the credit approval process had come to an end.

In the middle of March 1992, while Marine was still conducting due diligence, John Clardy, Jr., introduced Norvet at a lunch meeting to Graeme McDougall, the Chairman of Environmental Products Amalgamated ("Environmental Products"), an Australian company that sold freon recovery and recycling equipment. John Clardy, Jr., was considering entering into a licencing agreement with Environmental Products. Although the Environmental Products deal was not part of the proposed Marine loan package, Berman testified at trial that Clardy Manufacturing, as a matter of priorities, was not going to enter into the Environmental Products deal unless the Marine loan was approved. At this lunch meeting, Norvet is alleged to have assured John Clardy, Jr., and McDougall that a "commitment letter" would be issued within the next two to five days, or in other words, that the loan would be approved within a matter of days. John Clardy, Jr., claims that based on this assurance, he entered into the contemplated licencing agreement with Environmental Products two days later. According to Clardy Manufacturing, Marine's failure to approve the loan made it impossible for the company to make timely payments as called for in the Environmental

---

that there were potential problems with dilution of the company's accounts receivable collateral, and that the company was just beginning to implement a perpetual inventory system, which Marine considered critical to Clardy Manufacturing's slow-moving inventory. Putkonen also noted that only a small portion of the loan would be going towards additional working capital, and the rest would be used for "non-growth" business purposes such as buying the stock of John Clardy, Sr., and paying off existing debt.

5

Products licencing agreement.

Clardy Manufacturing eventually brought suit against Marine alleging breach of contract, fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel. After a bench trial, the district court awarded Clardy Manufacturing $8,111,467 on its breach of contract claim, rejected the DTPA claim, and declined to consider Clardy Manufacturing's alternative common law theories of recovery. Marine appeals from the award of damages, and Clardy Manufacturing cross-appeals from the district court's denial of its DTPA claim and failure to consider its alternative common law claims.

II

A

Marine contends that the district court erred in concluding that the January 1992 letter agreement was a satisfaction contract. The interpretation of an unambiguous contract is a question of law which we review *de novo. Guidry v. Halliburton Geophysical Servs., Inc.,* 976 F.2d 938, 940 (5th Cir.1992). However, when a contract is ambiguous and its construction turns on the consideration of extrinsic evidence, we review the district court's interpretation for clear error only. *Id.* The initial determination that a contract is *ambiguous,* such that its interpretation warrants the consideration of extrinsic evidence, is itself a legal conclusion subject to *de novo* review. *Id.* We look to state law to provide the rules of contract interpretation. *Matter of Haber Oil Co., Inc.,* 12 F.3d 426, 443 (5th Cir.1994).

6

Under Texas law, a contract is ambiguous if, after applying established rules of interpretation, the written instrument "remains reasonably susceptible to more than one meaning." *R & P Enterprises v. LaGuarta, Gavrel & Kirk,* 596 S.W.2d 517, 519 (Tex.1980); *see also Towers of Texas, Inc. v. J & J Systems, Inc.,* 834 S.W.2d 1, 2 (Tex.1992) ("A written instrument is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration the circumstances present when the instrument was executed."); *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1979) (requiring a "genuine uncertainty" as to which of two meanings is proper). On the other hand, if a contract is worded so that a court can give it a certain or definite legal meaning or interpretation, it is not ambiguous. *R & P Enterprises,* 596 S.W.2d at 519. Where the contract is unambiguous, extrinsic evidence "will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951); *Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941).

We must enforce the unambiguous language in a contract as written, and the applicable standard is "the objective intent" evidenced by the language used, rather than the subjective intent of the parties. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). In determining whether the language of the contract is unambiguous, however, we "should examine and consider

7

*the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983) (emphasis in original). Furthermore, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* With these rules of construction in mind, we turn now to the January 1992 letter agreement between Clardy Manufacturing and Marine.

B

The letter agreement begins by stating that its purpose is to "set forth the financial accommodations that Marine would be willing to consider in addressing CM's [Clardy Manufacturing's] financial needs." The letter proceeds to describe these financial accommodations, or "Credit Facilities," in some detail: "Marine would consider offering CM a 3 year revolving credit facility";[4] "Marine would consider offering the Company a 3 year term loan facility."[5] The letter states when the "Credit Facility" and "Term

---

[4]Under the "Revolving Credit" line, Marine stated that it would consider offering advances in an aggregate principal amount at any time outstanding equal to the lesser of $3 million, or up to eighty percent (80%) of the company's eligible accounts receivable plus up to fifty percent (50%) of the lower of cost or market value of Clardy Manufacturing's eligible finished goods inventory, but that in no event would inventory advances exceed $1 million.

[5]Under the "Term Loan," Marine stated that the loan would be in a principle amount equal to the lesser of $1 million or *the sum of* (i) up to sixty percent (60%) of the auction value of the Company's eligible machinery and equipment *and* (ii) up to fifty percent (50%) of the fair market value of the Company's real property.

Loan" would be repayable, what interest would be applicable to the principle outstanding, how collections would be processed, and what secured interests in collateral and personal guarantees would be required.[6]  Under the heading "*Fees:  Prepayment Premium,*" the letter states, "If the Credit Facilities are approved and funded, CM would be required to pay to Marine" certain origination fees and unused line fees.  The letter also states, "If the Credit Facilities are approved and funded, Marine would require CM to provide" certain monthly financial statements and other periodic financial reporting as specified.

In setting forth the financial accommodations that Marine *would be willing to consider,* the letter also frames the proposed terms and conditions in conditional language.  Marine *would consider* offering Clardy Manufacturing a revolving credit facility and term loan.  The letter notes that *if the Credit Facilities are approved and funded,* then these would be the terms and conditions. The conditional or proposed nature of the financial accommodations is underscored by the bold language that follows the recitation of potential terms and conditions, where the letter states, "*Non-Binding Proposal Only:  Due Diligence Required*" and "THIS PROPOSAL LETTER IS NOT A COMMITMENT TO LEND."  Clardy Manufacturing argues that this language merely establishes that the letter agreement is not *yet* a firm commitment to lend, and that the commitment to lend

_____

[6]The letter also states, "Proceeds from the credit facilities would be used to refinance bank debt, acquire certain assets of Premier Air Parts, Inc., purchase capital stock from John Clardy Sr. and provide continuing working capital."

9

does become binding once Clardy Manufacturing satisfies Marine's due diligence requirements. The letter does set out a number of events that would have to precede the issuance of a commitment letter obligating Marine to extend the loan to Clardy Manufacturing:

> Prior to the issuance of any commitment letter, Marine would perform a field examination of CM, perform background investigations of CM management and shareholders, complete Marine's internal credit approval process, review financial information with CM, evaluate current appraisal information, and verify the Company's compliance with all regulations, rules, and directives of all local state, and federal regulatory and licensing agencies, including, without limitation, environmental agencies. Marine would require CM to prepare a long-range business and strategic plan, in form and substance satisfactory to Marine, including monthly forecast for the first twelve (12) months following the Closing Date, encompassing all segments of CM's business. Issuance of a commitment letter would be subject to, among other things, your completion of all of the foregoing items, to Marine's satisfaction and all of the matters discussed in this letter.

We do not find that it is reasonable, however, to read this language to suggest that a commitment letter would necessarily issue upon the completion of these enumerated items. They are neither so definite nor so all inclusive as to warrant such a conclusion. In fact, the list concludes with the statement that issuance of a commitment letter would be subject to the completion of, *among other things,* the foregoing items.[7] This language clearly signals that Marine's credit approval process will consist of more steps than are set out in this proposal letter.

The agreement that Clardy Manufacturing and Marine reached in

---

[7]In addition, the letter does not spell out the details of "Marine's internal credit approval process," which must also be completed before a commitment letter will be issued.

10

this letter is clear and unambiguous.  Under the heading "*Execution of Proposal Letter,*" the letter states that "Marine will undertake further efforts to assess whether CM satisfies Marine's criteria for the extension of the Credit Facilities outlined herein only if" Clardy Manufacturing signs the letter and deposits $25,000 with Marine to be applied toward the cost of conducting due diligence.  In other words, Marine agreed to undertake *further efforts* towards determining Clardy Manufacturing's eligibility for a loan if the company agreed to pay for the related expense.[8]  There is nothing in this agreement which suggests that Marine was binding itself to issue a commitment letter upon the successful completion of the due diligence outlined in the letter.  Such a conclusion would require us, unreasonably, to believe that Marine had contracted away the normal and customary subjective decision making which enters into the final stages of a loan approval process.[9]  This reading of the proposal letter is belied even by the language covering the return of the $25,000 deposit.  The letter states, "If the Credit Facilities close," any remaining deposit after costs will be

---

[8]Marine eventually returned $6,840.35 to Clardy Manufacturing, which represented the unused portion of the $25,000 deposit.

[9]Under Texas law, a contract's language may be construed in light of "surrounding circumstances," which includes "what the particular industry considered to be the norm or reasonable or prudent at the time." *Staff Indus., Inc. v. Hallmark Contracting, Inc.,* 846 S.W.2d 542, 546 (Tex.App.—Corpus Christi 1993, no writ). Berman acknowledged at trial that the analysis of a loan application was necessarily a somewhat subjective procedure. *See generally* DAVID A. ROBINSON, ACCOUNTS RECEIVABLE AND INVENTORY LENDING 10 (3d ed.1987) (offering guidance regarding the "sophisticated credit judgments" that bear on accounts receivable and inventory lending).

applied to the facilities fee.  However, "If Marine declines to close the Credit Facilities," the deposit will be returned less costs.  If the issuance of a commitment letter was guaranteed upon the successful completion of due diligence, Marine would have no power to *decline* to close the credit facilities.

Having considered the entire writing, we conclude that the language of the letter agreement between Clardy Manufacturing and Marine is reasonably susceptible to only one meaning.  In part, the proposal letter serves to set out the terms and conditions of the credit facilities, or loans, that Marine is considering extending to Clardy Manufacturing.  Beyond this, the letter also contains an agreement by Marine to undertake further efforts to assess whether Clardy Manufacturing satisfied its credit criteria by conducting due diligence as outlined in the letter.  The letter does not, however, constitute a satisfaction contract.  We find that the letter agreement between Clardy Manufacturing and Marine is unambiguous and does not require us to consider extrinsic evidence to determine its meaning.

The district court concluded that the letter agreement was ambiguous as to "what, if anything, was Marine obligated to do if it became satisfied with Clardy Manufacturing's demonstration of creditworthiness?"  This conclusion, however, flows from the faulty assumption that the letter agreement was intended to address each and every step leading up to the issuance of the commitment letter.  As we have found, the proposal letter unambiguously memorializes the agreement that Marine should undertake further due diligence as

12

part of its effort to evaluate Clardy Manufacturing's loan application. The letter agreement's failure to address what further steps Marine would undertake as part of its internal credit approval process once it had become satisfied with Clardy Manufacturing's creditworthiness does not necessarily render ambiguous the agreement to undertake due diligence. As the letter agreement did not obligate Marine to take further steps upon the successful completion of due diligence, the writing had no need to speak to this issue. While it may seem unfair to suggest that Marine was free to simply walk away following the completion of due diligence, the letter agreement's silence on this issue does not destabilize the letter's clear and unambiguous language.

Although we will not consider extrinsic evidence for the purpose of creating an ambiguity in what we perceive to be the clear meaning of the letter agreement's language, *see Universal C.I.T. Credit Corp.,* 243 S.W.2d at 157, we note that the extrinsic evidence relied on by the district court does not cast doubt on our reading of the document. Drawing on a comparison between the letter agreement and language required by Marine's credit policy manual, the district court concluded that Norvet intended to make the letter agreement sound "more binding" than the normal proposal letter. The district noted that according to Marine's policy manual, a letter of intent or a preliminary proposal "must contain language substantially in conformance with the following:"

> Please note that this letter is not a binding commitment of [borrower] or [Marine], nor does it define all of the terms and conditions of the financing, but is a framework upon which the documentation for this transaction shall be structured,

13

and is a basis for further discussion and negotiation of the terms as may be appropriate. The credit shall be subject to due diligence review of the business and financial affairs of [borrower] with [borrower's] management, the approval of the proposed terms and conditions by the [Marine] credit authorities, and the execution and delivery of documentation satisfactory in form and substance to [Marine's] legal counsel.

Although the language in the policy manual is perhaps worded more pointedly than the letter agreement, we disagree with the district court that the letter agreement does not contain language substantially in conformance with this paragraph. Moreover, in contrast to the typical letter of intent contemplated by the language in Marine's policy manual, the proposal letter in this case does contain a definite agreement between the parties, namely to have further due diligence conducted as part of the credit approval process.[10]

---

[10]The presence of this agreement in what is otherwise a proposal letter also helps explain why the district court is mislead in its reliance on another piece of extrinsic evidence. The district court focussed on the fact that the letter agreement contained a signature line for Clardy Manufacturing with the recitation, "ACKNOWLEDGED AND AGREED TO," similar to Marine's form commitment letter which has a signature line for the borrower and the recitation, "Accepted and Agreed to." In light of the agreement between the parties in this case to have further due diligence undertaken, we do not find that the inclusion of a signature line and "agreed to" language casts any doubt on our conclusion as to the unambiguous meaning of the proposal letter.

Clardy Manufacturing also argues that evidence that approval of the loan was contingent upon the satisfactory completion of due diligence can be found in the required payment of the $25,000 deposit and the confidentiality clause, which, Clardy Manufacturing claims, were "intended to prevent Clardy Manufacturing from looking elsewhere." At trial, Marine's representatives acknowledged that the confidentiality clause was intended to prevent Clardy Manufacturing from "shopping" these loan terms and conditions with other banks. Even if we accept that these provisions were intended to keep Clardy Manufacturing from seeking financing elsewhere, we fail

14

The district court further erred by relying, at the outset, on the rule of strict construction against the drafter to hold that Marine was required to honor the "more binding" language drafted by Norvet. We note that the rule *contra proferentem* "is not one of the favored rules of construction. Indeed, it is said that it is to be resorted to only when the other rules fail." *Smith v. Davis,* 453 S.W.2d 340, 344 (Tex.App.—Fort Worth 1970, writ ref'd n.r.e.) (internal quotation marks omitted); *see also id.* (refusing to apply the rule even though there was an ambiguity in the contract). Certainly, "the rule has no application where ... the intent of the parties is clear and a resort to the rule will defeat that intent." *Modular Technology Corp., Metal Bd. Division v. City of Lubbock,* 529 S.W.2d 273, 276 (Tex.App.—Amarillo 1975, writ ref'd n.r.e.). Accordingly, we find that the district court erred in concluding that the letter agreement was a satisfaction contract. Because there is no underlying satisfaction contract, there can be no damages for breach of that contract. Accordingly, we vacate the district court's award of damages on Clardy Manufacturing's contract claim.

III

On cross-appeal, Clardy Manufacturing contends that the district court erred in concluding that it failed to state a claim under the Texas Deceptive Trade Practices Act. TEX.BUS. & COM. CODE.ANN. § 17.41 *et seq.* In order to state a claim under the DTPA,

---

to perceive how this evidences an intent on Marine's part to enter into a satisfaction contract.

the plaintiff must establish that he is a "consumer" as defined by the Act. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980). The district court concluded that Clardy Manufacturing did not qualify as a "consumer" under the Act. Whether a plaintiff is a "consumer" under the Act is a question of law which we review *de novo. Schmueser v. Burkburnett Bank,* 937 F.2d 1025, 1028 (5th Cir.1991).

The Act defines "consumer" as an individual "who seeks or acquires by purchase or lease, any goods or services." TEX.BUS. & COM.CODE.ANN. § 17.45(4). Moreover, the purchased goods or services must form the basis of the complaint. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981). The DTPA defines "goods" as "tangible chattels or real property purchased or leased for use." TEX.BUS. & COM.CODE.ANN. § 17.45(1). And "services" are defined as "work, labor or service purchased or leased for use, including services furnished in connection with the sale or repair." TEX.BUS. & COM.CODE.ANN. § 17.45(2). In *Riverside,* the Texas Supreme Court has held that the extension of credit does not constitute "goods" or "services" under the Act. *Riverside,* 603 S.W.2d at 175; *see also FDIC v. Munn,* 804 F.2d 860, 863 (5th Cir.1986) (summarizing Texas law as holding that "goods" and "services" do not include intangible chattel such as stocks, money, or loans).

The court in *Riverside,* however, left open the question whether activities related to the loan transaction, such as financial counseling, could constitute "services" under the Act.

16

*Riverside,* 603 S.W.2d at 175 n. 5. Texas courts have generally limited *Riverside* 's holding to cases where the loan was the plaintiff's main objective and forms the sole basis of the complaint. *See Munn,* 804 F.2d at 864 (citing cases).[11] Clardy Manufacturing claims that it qualifies as a "consumer" under the Act in that it sought to purchase the "loan services" Marine provided. The loan application process, however, was never an objective of Clardy Manufacturing's separate and distinct from the credit facilities which the company hoped to obtain from Marine.[12] The sole basis of Clardy Manufacturing's complaint is the denial of the credit facilities. Accordingly, we affirm the district court's determination that Clardy Manufacturing has failed to state a claim under the Texas DTPA.

IV

Clardy Manufacturing also cross-appeals from the district court's failure to address its alternative common law claims for

---

[11]*See, e.g., Flenniken v. Longview Bank and Trust Co.,* 661 S.W.2d 705, 708 (Tex.1983) (concluding from a series of transactions that plaintiffs sought to acquire a house, not a loan, and that this formed the basis of their complaint)*; First Federal Savings & Loan Ass'n of San Antonio v. Ritenour,* 704 S.W.2d 895, 900 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) (concluding that the plaintiff's claim was based on the purchase of financial counseling separate from the certificate of deposit).

[12]In fact, we agree with the district court that the "loan services," or the due diligence, was solely for Marine's benefit, and that Clardy Manufacturing would have gladly bypassed this step and gone straight to the issuance of the commitment letter if permitted. Nor is Clardy Manufacturing claiming that the due diligence was not performed, or that it was performed inadequately. Rather, the company is merely complaining that Putkonen, in deciding not to recommend the loan application for approval, reached the wrong conclusion based on this due diligence.

fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel. Evidence was submitted at trial in support of each of these alternative theories of recovery. Having granted Clardy Manufacturing full recover under its contract claim, the district court declined to reach these alternative claims. If we were to remand this case, it would only remain for the district court to enter findings of fact and conclusions of law as to these alternative claims. We conclude, however, that remand in this case is unnecessary because Clardy Manufacturing's alternative claims all fail as a matter of law. *See Halbert v. City of Sherman, Texas,* 33 F.3d 526, 530 (5th Cir.1994) (declining to remand claims to district court where plaintiff would be unable to prevail even if afforded the opportunity to amend his pleadings); *Brown v. Texas A & M University,* 804 F.2d 327, 334 (5th Cir.1986) (same).

A

Under Texas law, the elements of a cause of action for negligent misrepresentation are:

> (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (citing the Restatement (Second) of Torts (1977)); *see also Inglish v. Union State Bank,* 911 S.W.2d 829, 837 (Tex.App.—Corpus Christi 1995, writ requested).

Clardy Manufacturing's claims of negligent or fraudulent

18

misrepresentation are based primarily on two sets of statements by a Marine representative.  As to one instance, John Clardy, Jr., testified at trial that at the Wednesday lunch meeting with Graeme McDougall, the Chairman of the Australian company Environmental Products, Norvet "stated that I would have a commitment letter by Friday or the following Monday or Tuesday."[13]  McDougall testified that Norvet had said that he "expected" a letter of commitment to be issued within the next two to five days because "from Marine Midland's point of view everything looked good.  The audit was good.  All the other relevant documentation that had to be done looked good."  John Clardy, Jr., claims that he detrimentally relied on this representation by entering into a licencing agreement with Environmental Products two days later.[14]

A claim for negligent misrepresentation under Texas law contemplates that the "false information" provided by the defendant is a misstatement of *existing* fact.  *Airborne Freight Corp. v. C.R. Lee Enterprises,* 847 S.W.2d 289, 294 (Tex.App.—El Paso 1992, writ denied).  "Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future, unknown event." *Sergeant Oil & Gas Co. v. National Maintenance & Repair, Inc.,* 861 F.Supp. 1351, 1360 (S.D.Tex.1994) (applying Texas law); *see id.*

---

[13]Berman also testified that Norvet had reported that "he had assured John Clardy, Jr., that we would be getting a commitment letter within the next two to five days."

[14]We note, however, that the agreement with Environmental Products was not referenced in the letter agreement, and that Berman acknowledged at trial that it would not have made any difference with respect to the business he did with Environmental Products whether the proposed loan went through or not.

19

(holding that defendant's representation that the barge could be loaded in eighteen to twenty-four hours was not actionable under a theory of negligent misrepresentation); *City of Beaumont v. Excavators & Constructors, Inc.,* 870 S.W.2d 123, 138 (Tex.App.—Beaumont 1993, writ denied) (holding that statements as to how long a work project would take to complete were not "false information").

In at least one case, a successful claim for negligent misrepresentation was based on a loan officer's statement that his bank had approved plaintiffs' loan. *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d at 441-42. The facts of *Sloane,* however, were distinguished by the court in *Alpha Road v. NCNB Texas National Bank,* 879 F.Supp. 655 (N.D.Tex.1995). In *Alpha Road,* the bank officer had represented that he needed additional authority, but that the loan was a "done deal" and that it would be renewed at the end of four months. 879 F.Supp. at 665. The court in *Alpha Road* concluded that unlike the representation in *Sloane,* the bank officer's assurances referred to the bank's *future* performance, and were therefore not actionable under a theory of negligent misrepresentation. *Id.* The facts in this case are in accord with those in *Alpha Road.*

Clardy Manufacturing does not contend that Norvet represented that the loan had in fact been approved, or that the commitment letter had already been issued. Even if we assume that Norvet said that the commitment letter *would* issue within two to five days, as

we must,[15] rather than that he "expected" the letter to issue within this time frame, we nevertheless conclude that this statement is not actionable as a misstatement of *existing* fact.  At most, Norvet's representation was a misstatement as to a *future* action by Marine.[16]

Moreover, under a claim for negligent misrepresentation, the plaintiff must prove "justifiable reliance" on the misrepresentation. *Geosearch, Inc. v. Howell Petroleum Corp.,* 819 F.2d 521, 526 (5th Cir.1987) (applying Texas law).  This requirement, also known as the "materiality" element, has two aspects:  "the plaintiff must in fact have relied;  and this reliance must have been reasonable." *Id.*  In other words, "there must be a reasonable relation between the contents of the defendant's misrepresentation and the action the plaintiff took in reliance." *Id.*  "The justifiableness of the reliance is judged in

---

[15]In determining whether Clardy Manufacturing has presented sufficient evidence from which a reasonable fact finder could find in its favor on the alternative common law claims, we "must review the evidence in the light and with all reasonable inferences most favorable to" Clardy Manufacturing. *Roberts v. United New Mexico Bank at Roswell,* 14 F.3d 1076, 1078 (5th Cir.1994) (internal quotation marks omitted).  "If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, [judgment as a matter of law] is proper." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).  There must be a conflict in "substantial evidence" to create a jury question. *Id.* at 375.

[16]As will be discussed *infra,* there is also no evidence in the record to indicate that Norvet did not believe what he said at the time he made the representation.  Nor did Clardy Manufacturing present any evidence establishing that Norvet was reckless to believe, at this time, that the commitment letter would issue shortly.

21

light of the plaintiff's intelligence and experience." *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 615 (5th Cir.1996). A plaintiff's reliance is unjustified when the reliance is in effect an act of negligence on the plaintiff's part. *Id.*

When viewed against all of the surrounding circumstances and the plaintiff's business experience, Clardy Manufacturing's reliance on Norvet's representation was, as a matter of law, unjustified. In other words, we find that no reasonable fact finder could conclude otherwise. John Clardy, Jr., and his advisor, Berman, knew at all times that Norvet had no credit approval authority. From the time he graduated from college in 1977, John Clardy, Jr., had been involved in managing the company his father founded, and as President of the company he had handled the task of negotiating with lenders for additional financing since 1989. Berman, aside from holding the position as President of Premier Air Parts, Inc., was also a former chairman of the board of a commercial bank, with twelve years of lending experience prior to that. Rather than waiting an additional two or three days to verify that a commitment letter did in fact issue, John Clardy, Jr., decided to enter into the licencing agreement with McDougall that Friday.[17] We find, as a matter of law, that there is no

---

[17]Evidence at trial established that McDougall, who had been in the United States for two months by the time of the lunch meeting, was anxious to return home to Australia for business and personal reasons. McDougall also testified that it would have been possible to sign the contract in Australia by fax machine and teleconference, or to have signed an agreement in principle conditioned on the issuance of the commitment letter, but that he

22

reasonable relationship between Norvet's assurances and Clardy Manufacturing's decision to enter into the licencing agreement two days later.  To the extent that John Clardy, Jr., in fact relied on Norvet's representation, this reliance was, under the circumstances and in light of John Clardy, Jr., and Berman's business sophistication, an act of negligence.

The other set of misrepresentations underlying Clardy Manufacturing's alternative claims focuses on what the company was told regarding Marine's credit approval process.  Both John Clardy, Jr., and Berman testified that Norvet told them, prior to signing the letter agreement, that the loan would be signed and approved in the Dallas office, and then shipped to Wilmington, Delaware, to be "rubber stamped," that is, reviewed for form and content.  In fact, no one in the Dallas office had credit approval authority, and a loan application required two or more signatures by Marine officials before it could be approved.  John Clardy, Jr., testified at trial that he would not have entered into the letter agreement if he had known that the ultimate credit approval would have to come from an office outside Dallas.[18]  We conclude, however, that

"chose, while I was here, to complete the job that I came to do."

[18]John Clardy, Jr., testified that he felt it was important to establish a personal relationship with the people making the credit approval decision.  We note that John Clardy, Jr., acknowledged that Frank Mederos was introduced at the January 7 meeting as someone from Marine's home office in Wilmington, Delaware, who would be a significant factor in the home office evaluation of the credit.  Berman also acknowledged that Mederos was introduced to him as someone from the home office who would have some input into the credit package, and that Mederos told them that he would review the credit package at his home office.

no reasonable trier of fact would believe that John Clardy, Jr., *in fact* relied on Norvet's representations regarding the loan approval process.[19] In other words, no reasonable trier of fact would conclude that Clardy Manufacturing, which for several years had been unsuccessfully seeking financing from numerous lenders,[20] would not have entered into the letter agreement if Marine had made explicit the fact that final credit approval had to come from outside of Dallas.[21] Clardy Manufacturing can therefore not show

[19]*Cf. Brown v. Ford Motor Co.,* 479 F.2d 521, 523 (5th Cir.1973) (reversing the jury's verdict because no reasonable jury could have disbelieved witness's uncontradicted testimony as to the alleged defect).

[20]In one instance, John Clardy, Jr., had traveled to Houston in an attempt to seek financing from Hong Kong Bank, an affiliate of the Hong Kong and Shanghai Banking Corporation.

[21]Clardy Manufacturing also claims that it relied on Norvet's representation at these early meetings that the loan could be approved and closed as early as February 28 and as late as March 31, 1992. As discussed above, however, this statement is not actionable inasmuch as it is merely an opinion as to a future event, not a misstatement of existing fact.

In addition, Clardy Manufacturing claims that Marine failed to disclose (1) that it was in the process of changing its credit approval process in late 1991 and early 1992 from a "committee process" to an individual signature process; (2) that Marine, along with its five other regional offices, were undergoing a reorganization that began in January 1992; and (3) that Jim Ely had left the Dallas office and that Kurt Putkonen, the credit manager for the Atlanta office, had assumed Ely's responsibilities for evaluating Clardy Manufacturing's loan application. Clardy Manufacturing has failed to identify any affirmative duty on Marine's part to disclose this information to Clardy Manufacturing. *See Emerald Texas, Inc. v. Peel,* 920 S.W.2d 398, 403 (Tex.App.—Houston [1st Dist.] 1996, no writ) ("[A] failure to disclose information is not fraudulent unless one has an affirmative duty to disclose, such as where a confidential or fiduciary relationship exists."); *see also Federal Deposit Ins. Corp. v. Coleman,* 795 S.W.2d 706, 708-09 (Tex.1990) (concluding that a duty of good faith is only imposed where a

that the representation was "material" to its decision to enter into the agreement. Moreover, to the extent that John Clardy, Jr., would not have entered into the agreement had he known the full extent of the credit approval process, we find that such reliance would have been, as a matter of law, unreasonable. No reasonable businessman in John Clardy, Jr., circumstances would have made such an irrational decision. Accordingly, this second set of representations will also not support a claim for negligent misrepresentation.

B

Under Texas law, to recover for fraud, the plaintiff must establish that:

> (1) a material representation was made; (2) it was false when made; (3) the speaker knew it was false, or made it recklessly without knowledge or its truth and as a positive assertion; (4) the speaker made it with the intent that it should be acted upon; and (5) the party acted in reliance and suffered injury as a result.

*Roberts v. United New Mexico Bank at Roswell,* 14 F.3d 1076, 1078 (5th Cir.1994). To be actionable, the misrepresentation must be "one concerning a material fact; a pure expression of opinion will not support an action for fraud." *Transportation Ins. Co. v. Faircloth,* 898 S.W.2d 269, 276 (Tex.1995). An opinion may constitute fraud, however, if the speaker knows that it is false. *Sergeant Oil & Gas Co. v. National Maintenance & Repair, Inc.,* 861 F.Supp. 1351, 1358 (S.D.Tex.1994). "An expression of an opinion as

---

"special relationship" exists marked by a shared trust or imbalance in bargaining power, and does not exist between a lender and its borrower).

to the happening of a future event may also constitute fraud where the speaker purports to have special knowledge of facts that will occur or exist in the future." *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). A promise to do an act in the future, on the other hand, is fraud "only when made with the intention, design and purpose of deceiving, and with no intention of performing the act" at the time the promise was made. *Airborne Freight Corp. v. C.R. Lee Enterprises, Inc.,* 847 S.W.2d 289, 294 (Tex.App.—El Paso 1992, writ denied).

Clardy Manufacturing failed to present any evidence that at the time Norvet allegedly represented that a commitment letter would issue within two to five days: (1) that Norvet knew that his representation was false; (2) that Norvet had special knowledge of future facts bearing on the issuance of the commitment letter; or (3) that Norvet or Marine had no intention of issuing the commitment letter or approving Clardy Manufacturing's loan application. "Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made." *Id.* Clardy Manufacturing has not presented any additional circumstantial evidence which would permit a reasonable trier of fact to find that Norvet's representation to John Clardy, Jr., and McDougall was fraudulent at the time it was made. *Cf. T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992) (concluding that plaintiffs had presented insufficient evidence that the bank had no intention to perform at the time its representative made the promise that bank would loan plaintiffs

26

$50,000).

A plaintiff in a fraud action must also show that his reliance was justifiable as well as actual. *Id.* "To determine justifiability, courts inquire whether—given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part." *Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1026 (5th Cir.1990).[22] For the same reasons set out above under Clardy Manufacturing's negligent misrepresentation claim, we also conclude that Clardy Manufacturing has failed, as a matter of law, to establish that Norvet's representations regarding the credit approval process were material to its decision to enter into the letter agreement. That is, no reasonable trier of fact could conclude that Clardy Manufacturing's reliance was actual and justifiable under the circumstances. Accordingly, neither set of alleged misrepresentations will support a claim of fraud.

C

Clardy Manufacturing's final alternative common law claim is for promissory estoppel. Under Texas law, the basic requirements of a promissory estoppel claim are: "(1) a promise, (2)

---

[22]Because the justifiable reliance element of a claim for negligent misrepresentation is generally equated with contributory negligence, some courts have concluded that "justifiable reliance" in the context of fraud represents a lesser burden on the plaintiff than in the context of negligent misrepresentation. *See, e.g., Haralson,* 919 F.2d at 1025 & n. 5; *Dupuy v. Dupuy,* 551 F.2d 1005, 1018 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983). Texas courts have also established a fourth and separate requirement of a "definite finding that *injustice can be avoided only by the enforcement of the promise." City of Beaumont v. Excavators & Constructors, Inc.,* 870 S.W.2d 123, 137 (Tex.App.—Beaumont 1993, writ denied) (emphasis in original). In addition, the courts have emphasized that "estoppel requires a *reasonable* or *justified* reliance on the conduct or statement of the person sought to be estopped by the person seeking the benefits of the doctrine." *Traco Inc. v. Arrow Glass Co.,* 814 S.W.2d 186, 190 (Tex.App.—San Antonio 1991, writ denied) (emphasis in original and internal quotation marks omitted).

The only alleged *promise* in this case is Norvet's assurance to John Clardy, Jr., and McDougall that the commitment letter would issue within the next two to five days. For the reasons set out above, we conclude as a matter of law that Clardy Manufacturing has not shown any reasonable or justified reliance on this alleged promise. *Cf. Bluebonnet Savings Bank, F.S.B. v. Grayridge Apartment Homes, Inc.,* 907 S.W.2d 904, 912 (Tex.App.—Houston [1st Dist.] 1995, no writ) (holding that there was no basis to support a claim for promissory estoppel where the plaintiffs had failed to establish justifiable reliance under a claim for negligent misrepresentation). Accordingly, Clardy Manufacturing has also failed to state a claim for promissory estoppel.

28

V

For the foregoing reasons, we REVERSE the district court's judgment on Clardy Manufacturing's satisfaction contract claim.  We AFFIRM the district court's determination that Clardy Manufacturing failed to state a claim under the Texas DTPA.  Having found that there is no theory under which Clardy Manufacturing could recover, we RENDER judgment in favor of Marine.