United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 8, 2004**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

m 03-40200

DENNIS JOSLIN,

Plaintiff-Third Party Plaintiff-
Appellee-Cross Appellant,

VERSUS

PERSONAL INVESTMENTS, INC.,

Defendant-
Cross-Appellee,

BASHER AHMAD,
ALSO KNOWN AS ROBERT HELMAND,
DOING BUSINESS AS PACIFIC LAND EXCHANGE,

Third Party Defendant-
Appellant-Cross-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
m C-00-CV-324

Before KING, Chief Judge, JONES AND SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

We consider here the validity of a verdict awarding plaintiff, an investor in delinquent loan packages, $50,000 for losses he suffered in reliance on misleading information that could have been debunked through a simple investigation, and that he was told not to rely on. The common law action for negligent misrepresentation is not an insurance policy entitling unwary investors to a refund whenever they are injured by their failure to investigate dubious information.

To prevail in such an action, the plaintiff must demonstrate that he was justified in relying on the misrepresentation. Concluding that the evidence and reasonable inferences drawn therefrom overwhelmingly favor a finding that plaintiff's reliance was not justified, we reverse and render a take-nothing judgment.

## I.

This case involves the market for delinquent loan pools sold at government auctions. The defendants are Basher Ahmad, also known as Robert Helmand, and his wholly owned close corporation, Personal Investments ("PI"). Like plaintiff Dennis Joslin, Helmand and PI are in the business of purchasing packages of delinquent loans at government auctions. Because the obligors on these loans are unlikely to make any further payments, the investment is valuable only to the extent that foreclosure affords an opportunity to gain title to an accompanying security interest.

In 1994, Helmand placed the highest bid on a package of loans that included a loan (the "Nix loan") originally taken out by Jimmy Nix, a real estate developer. The Nix loan was secured by a deed of trust in a subdivision that Nix was developing (the "Nix deed"). Soon after acquiring this interest, Helmand foreclosed on the Nix deed of trust and purchased the lots at his own foreclosure sale. Instead of paying cash for this interest, Helmand credited the Nix loan $250,000.

A title search revealed, much to Helmand's disappointment, that the interest so acquired was junior to several other encumbrances. These were collectively valued at a price higher than the appraised value of the property, making Helmand's interest effectively worthless.

Helmand contacted the federal agency from which he had purchased the package, seeking a refund for the Nix loan. Ultimately, that agency's successor in interest, the Federal Deposit Insurance Corporation ("FDIC"), agreed to refund the purchase price in exchange for an assignment of the original deed of trust.[2]

Helmand claims to have protested at length that he could not assign the extinguished interest represented by the Nix deed, and offered instead to convey his substitute trustee's deed. As he tells the story, however, the FDIC was not interested and insisted that a refund would be available only if Helmand assigned that which he no longer had. Helmand ultimate-

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] The Nix deed had more value to the FDIC than it did to Helmand, because the FDIC already owned the other encumberances on the land and could pool all the interests together for sale to a single party.

lySSand again as he tells it, reluctant-lySSrelented to the FDIC's demand and, in March 1996, assigned to the FDIC the now-extinguished Nix deed in exchange for a $177,000 refund. Naturally, he kept his own recorded interest in the property.

The documents assigning the Nix deed did not indicate that it had been foreclosed. An accompanying ledger card should haveSSbut did notSSreflect the $250,000 credit Helmand had placed on the loan at foreclosure. Although that document contained a notation saying "Send to Foreclosure," there was no written indication on the ledger card or the Nix deed to indicate that the interest had been foreclosed on and sold at auction. Helmand knew, at this time, that the FDIC was re-acquiring the deed assignment and the ledger card so they could be used as supporting documents in a subsequent auction of the Nix loan.

In February 1997SSalmost a year after Helmand received his full refundSShis lawyer, Jim Balis, sent a letter to the FDIC declaring that Helmand recently had discovered that the foreclosure in 1994 preceded the assignment to the FDIC in 1996 and that, as an unfortunate result, FDIC had paid $177,000 for a worthless interest in real property. Helmand's disclosure to the FDIC would be a tautology, however, if he indeed had been telling the agency all along that he had foreclosed on the loan and had taken title to the collateral.

Nevertheless, Balis's letter offered to tender Helmand's deed to the FDIC, but explained that there was a pending tax suit filed against the property by Nueces County, Texas. The FDIC did not respond to this letter or to Helmand's two attempts to mail it a deed. The property was sold by the county at a tax auction, where PI purchased it for a net investment of $60,000.

In 1996, Joslin participated in an FDIC auction at which he successfully bid on a package of loans that included the Nix loan and the now worthless Nix deed. To formulate his bid, Joslin was given access to a loan file containing documentation for many, if not all, the loans in his pool. He arrived at a bid value by examining the documents in the loan file and, without performing any outside investigation, sharply discounting their paper value to reflect the inherent risk in purchasing distressed assets. In this manner, he ultimately placed a value of $34,483 on the Nix loan and Nix deed as part of a total bid of more than $1.2 million.

When, in 1999, Joslin discovered that Helmand had stripped the Nix loan of its collateral before selling it back to the FDIC, Joslin's attorney contacted PI and asserted a claim over the property. PI sued Joslin in state court, seeking to quiet title to the lot.

Joslin removed the case to federal court, asserting diversity jurisdiction, and filed a counter-claim against PI and a third-party complaint against Helmand, alleging fraud, negligent misrepresentation, constructive fraud, and conspiracy. The district court re-aligned the parties to make Joslin the plaintiff, dismissed all the claims against PI, and entered judgment as a matter of law ("j.m.l.") in favor of Helmand on the constructive fraud and conspiracy claims.

The jury found Helmand liable for negligent misrepresentation, but not fraud, and awarded damages of $50,000. Helmand appeals the verdict against him, and Joslin cross-appeals the j.m.l. and the calculation of prejudgment interest.

## II.

We review a verdict only to determine whether there is a legally sufficient evidentiary basis for the jury to find as it did. *Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1009 (5th Cir. 1998). We draw all reasonable inferences in favor of the non-moving party, without weighing the evidence or assessing the credibility of witnesses. *Serna v. City of San Antonio*, 244 F.3d 479, 482 (5th Cir. 2001). "There is no legally sufficient evidentiary basis when the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219 (5th Cir. 2001).

Texas courts follow the common law definition of negligent misrepresentation embodied in the Restatement (Second) of Torts § 552. *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). The elements of the tort are that

> (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Id.*

There are sufficient facts on which a jury could determine that the first three elements of this test are met. The representations were the transfers of a deed of trust failing to reflect that its value had been eviscerated by foreclosure, and a ledger card failing to reflect the $250,000 credit Helmand had used to purchase the foreclosed property. The record shows that Helmand had substantial experience in this business and intended the documents to be used in future FDIC auctions. That evidence adequately supports a finding that the statements contained false information, were made in the course of Helmand's business, and were (at least) negligently given.

We reverse the judgment that is based on the verdict, however, because the record does not support a finding of justifiable reliance on the part of Joslin. Leaving aside the scant evidence of actual reliance (Joslin's testimony regarding his habits minimally establishes that he probably relied on the documents in preparing his bid.), it was unreasonable for Joslin to formulate his bid in reliance on the accuracy of documents in the loan file.

Under Texas law, a plaintiff must prove reasonable reliance. *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.,* 88 F.3d 347, 358 (5th Cir. 1996). The reasonableness of reliance is measured in light of the plaintiff's intelligence and experience. *Id*. Moreover, the context in which information is given will affect the conclusion whether a party was justified in relying thereon.[3] Reliance is unjustified where the act of reliance is itself an act of negligence by the plaintiff. *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 615 (5th Cir. 1996).

---

[3] *See, e.g., McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999) (finding unreasonable the reliance on an attorney's representations in an adversarial context); *Lesikar v. Rappeport*, 33 S.W.3d 282, 319 (Tex. App.§§Texarkana 2000, pet. denied) (same).

Joslin had between two and five weeks in which to formulate his bid and perform the necessary due diligence. The FDIC's loan sale agreement warned Joslin and other investors not to rely on any documents provided by the FDIC, and urged that the investor perform whatever investigations he "deems to be warranted."

Joslin used his time to review the documents in the various loan files to arrive at a bid price, but he did not run title searches on the properties listed as security. Instead, it was his custom to enter numerous bids, discounting the value of the assets to account for the likelihood that some loans in a pool would be worthless. By discounting in this manner, Joslin, in his bid, valued the Nix loan at only $34,483, or around one-tenth of the land's appraised value of $346,000.

It was only after he placed a winning bid at auction that Joslin assigned his employees the task of investigating his interest in the collateral he had purchased. As a result, it was not until 1999 that Joslin discovered the Nix deed had been extinguished by the foreclosure.[4]

Joslin argues that a reasonable jury could find his reliance justified, because the nature of the market for delinquent loans requires him to assume that the documents contain some minimal semblance of accuracy. He points out that the loans are auctioned off in large pools, each containing too many parts to allow for detailed due diligence.

Although acknowledging he takes a risk that any individual loan will turn out to be worthless, Joslin argues that he did not take a corresponding risk "that one of his fellow bidders would rig the auction by stripping the asset of its collateral," causing buyers to place unrealistic bids on completely worthless property. Joslin reasons that by injecting deliberately false information into the marketplace, Helmand distorted the normal balance of risks and rewards on which Joslin and others relied in formulating their bids.

This explanation is unavailing. Joslin was unable to persuade the jury, by a preponderance of the evidence, that there was fraud. As a result, the reasonableness of Joslin's reliance cannot be established by an argument that no reasonable investor should be punished for having failed to anticipate fraud. Indeed, had actual fraud been shown, Joslin would not have needed to prove the reasonableness of his reliance.[5]

---

[4] Consequently, his negligent misrepresentation claim would have been barred by the statute of limitations, had that been raised. *See Milestone Props., Inc. v. Federated Metals Corp.,* 867 S.W.2d 113, 119 (Tex. App.SSAustin, 1993, no writ) (two-year limitations period applies to negligent misrepresentation claims); *Heci Exploration Co. v. Neel*, 982 S.W. 2d 881, 886-87 (Tex. 1998) (discovery rule does not toll two-year limitations period where misrepresentation was discoverable in the title records). Federal courts sitting in diversity apply state statutes of limitations. *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1145 (5th Cir. 1997). But, we do not decide the case on this (continued...)

[4](...continued) ground, because Helmand did not argue the point, as was his burden to do. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988).

[5] The elements of common law fraudulent misrepresentation in Texas are that (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew of the representation's falsity when it was (continued...)

Measured by the jury's decision to absolve Helmand of responsibility for the alleged intentional actSSa finding Joslin does not challenge as being erroneousSSHelmand's statements are nothing more than an inadvertent mistake, negligently made. In this respect, nothing distinguishes those statements from the bevy of other inaccurate documents in the loan files, many of which place an unrealistic paper value on the assets to which they correspond.

Joslin took the same risk with respect to each of those documents: He chose to invest without investigating the accuracy of any of the statements contained therein, hoping that his profit from the accurate documents outweighed his losses on the inaccurate ones.

The evidence, viewed in the light most favorable to Joslin, fails to demonstrate a legally sufficient justification for his reliance on the documents in the loan files. He was expressly warned not to rely on any statements found in the files, and he easily could have dispelled any lingering doubt over the accuracy of the statements by performing a simple title search. He chose instead to apply a discount factor to the value represented in the loan files, and it is unreasonable for him now to fault the negligence of another for his losses from the investment.

Reliance under those circumstances is itself an act of negligence, insufficient to support a verdict. *See Clardy Mfg.*, 88 F.3d at 358. Joslin cannot now supplement his profits from

the risks that panned out with tort judgments for the risks that did not. The verdict and damage award are vacated.[6]

### III.

Joslin cross-appeals the j.m.l. on his claims of constructive fraud and conspiracy, and the court's partial failure to award prejudgment interest. There is no error.

In Texas, constructive fraud lies where a party breaches a "legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex. 1965). State appellate courts frequently intimate that this occurs only where there is a fiduciary relationship between the parties,[7] and a "decision by an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *First Nat'l Bank v. Trans Terra Corp. Int'l*, 142 F.3d 802,

---

[5](...continued)
made; (4) the defendant made the representation with the intention that the plaintiff act on it; and (5) the plaintiff detrimentally relied on the misrepresentation. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992).

[6] As a result, we do not reach Helmand's argument that, under *Trans-Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691 (Tex. App.SSEastland 2002, no pet.), Joslin lacks standing to sue Helmand for negligent misrepresentation.

[7] *See, e.g., Jean v. Tyson-Jean*, 118 S.W.3d 1, 9 (Tex. App.SSHouston 2003, pet. filed) ("Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary relationship."); *Connell v. Connell*, 889 S.W.2d 534, 542 (Tex. App.SSSan Antonio 1994, writ denied) ("To prove constructive fraud appellants must introduce evidence that Alvin breached a legal or equitable duty, which the law declares fraudulent because it violated a fiduciary relationship.").

809 (5th Cir. 1998).

Joslin does not dispute that there is no evidence of such a relationship here, but instead relies on *dictum* in *Vickery v. Vickery*, 999 S.W.2d 342 (Tex. 1999), for the proposition that a fiduciary relationship is not necessary. His argument has no merit. In *Vickery*, *id.* at 378, the court indicated that constructive fraud is "most frequently" found only in cases where such a relationship exists, but it did not cite a single instance where a fiduciary relationship was not present and the tort was nevertheless found to lie.

Joslin does not cite any such cases either, nor has our research revealed any. In any event, Joslin fails to point to anything that would qualify as a commensurate "legal or equitable duty," *Archer*, 390 S.W.2d at 740, that would justify excusing his inability to prove an intent to deceive on Helmand's part. The district court properly granted j.m.l. on this ground.

Joslin concedes that the above stated analysis also forecloses his claim of conspiracy to commit constructive fraud, because the alleged conspiracy would have, as its object, the commission of a non-tortious act. Moreover, there can be no conspiracy here, because Joslin asserts nothing more than that Helmand directed his wholly-owned close corporation to act for his benefit, and there is, accordingly, no allegation of a meeting of two independent minds. *See Elliott v. Tilton*, 89 F.3d 260, 265 (5th Cir. 1996). The district court properly granted j.m.l. on this ground, as well.

Inasmuch as we reverse all damages awarded to Joslin, the question of prejudgment interest is moot. The judgment is REVERSED in part and AFFIRMED in part, and we RENDER a take-nothing judgment against Joslin.

7