**In re EL PASO REFINERY, L.P., a Delaware Limited Partnership, Debtor.**

**Bankruptcy No. 94–30051–LMC.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Jan. 20, 2000.

TX, David Michael Bond, D. Bobbitt Noel, Jr., Vinson & Elkins, Houston, TX, for Scurlock Permian Corp.

ORDER AND MEMORANDUM OF DECISION DIRECTING TRUSTEE TO DISTRIBUTE FUNDS AS PAYMENT OF INTEREST UNDER 726(A)(5) TO THE HOLDERS OF ALLOWED UNSECURED UNSUBORDINATED CLAIMS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the General Unsecureds [1] Motion for Reconsideration of the court's November 1, 1999, written Order which Granted the Trustee's Motion to Make Additional Interim Distributions to Glitsch Field Services, Inc. (the "Distribution Order") in full payment of Glitsch's allowed unsecured subordinated claim.

## I. BACKGROUND

This case marks yet another chapter in the seemingly endless saga of the El Paso Refinery, L.P. bankruptcy case. In light of the complexity of this case, a summary of the procedural background is necessary.

On October 23, 1992, El Paso Refinery, L.P. (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On November 2, 1993 the Court converted the bankruptcy case to a Chapter 7 and Andrew Krafsur was appointed as the interim trustee. After the conversion and divisional venue transfer of the case to the El Paso Division (and after a contested trustee election), Krafsur was elected as the permanent trustee to serve as the official representative of the Debtor's bankruptcy estate.

On March 11, 1993, Glitsch Field Services, Inc. ("Glitsch") [2] filed an adversary

Margaret Anne Christian, Kemp, Smith, Duncan & Hammond, El Paso, TX, for Andrew B. Krafsur.

Thomas S. Leatherbury, J. Michael Sutherland, Vinson & Elkins, Dallas, TX, Robbi B. Hull, Vinson & Elkins, Austin,

---

**1.** The General Unsecureds (the holders of allowed unsecured unsubordinated claims against the debtor's estate) include: El Paso Electric Company, B–One Ltd. Partnership, UOP, and St. Paul Fire & Marine Insurance Company. In the present motion, the General Unsecureds are the parties who assert that the Trustee should distribute the available funds to payment of post-petition interest on their claims prior to payment of Glitsch's allowed unsecured subordinated claim.

**2.** HFM Field Services, Inc. is the successor by name change to Glitsch Field Services, Inc. Any reference to Glitsch as the holder of the

proceeding[3] seeking declaratory relief regarding the priority of alleged secured claims on the Debtor's real property and related personal property. In the Glitsch Adversary Proceeding, Glitsch contended that it held a valid and perfected mechanic's and materialman's lien ("M & M lien")[4], securing indebtedness of approximately $2,851,195.23, senior in priority to the security interests held by the Term Lenders on certain real property and improvements (the "Refinery Assets") then owned by the Debtor. On May 4, 1993, the Term lenders foreclosed their security interests covering the Refinery Assets on which Glitsch claimed its M & M lien, though the parties preserved the legal issues that were the subject of the adversary proceeding.

On August 13, 1994 (after the case had been converted), Glitsch, the Trustee and the Term Lenders arrived at a settlement, and filed a motion seeking court approval of their deal, with notice to all creditors, including the General Unsecureds. The Glitsch Compromise Motion did not draw an objection from the General Unsecureds

at the time, and on September 21, 1994, the court entered an Order approving the compromise (the "Glitsch Compromise Order").[5]

Under the settlement approved in the Glitsch Compromise Order, Glitsch's M & M lien claim was bifurcated. First, the Term lenders agreed to pay $2,509,051.80 of the $2,851,195.43 claimed by Glitsch as a secured claim (by virtue of its M & M lien). Second, Glitsch was granted an allowed unsecured claim against the estate for $342,143.43, representing the deficiency.[6] Finally (and pertinent to this case), the Glitsch Compromise Order granted Glitsch an allowed unsecured subordinated claim[7] against the estate in the amount of $933,624.38, for contractual interest and attorneys' fees Glitsch incurred in the prosecution of its M & M lien claim. This third claim would not otherwise have been assertable against the estate, because unsecured creditors are not entitled to recover either post-petition interest or post-petition attorneys' fees, and secured creditors can only recover such claims if they are oversecured (and even then, only to

"Glitsch Subordinated Claim" should be read as meaning and referring to HFM.

**3.** Styled *Glitsch Field Services v. El Paso Refinery, L.P. et al.,* adversary no. 94–3003 (the "Glitsch Adversary Proceeding"). The parties to the prior adversary proceeding included Glitsch, the Term Lenders, Scurlock Permian Corporation, Bank Brussels Lambert, and the Trustee.

**4.** The M & M lien was based on labor and materials that Glitsch furnished to the debtor prepetition.

**5.** An important series of events culminated in the September 21, 1994 settlement. After the Term Lenders foreclosed their security interests on May 4, 1993, Glitsch filed a motion for summary judgment in the Glitsch adversary asserting that as a matter of law the subordination provisions in the intercreditor agreement among the Term Lenders, Scurlock Permian, and Bank Brussels Lambert resulted in the M & M liens held by Glitsch having first and senior priority over all other liens against the refinery assets. This court overruled that motion for summary judgment. The court

then set the Glitsch Adversary Proceeding for a bifurcated trial. Phase One of the trial involved the events surrounding the construction project to expand and upgrade the refinery. The purpose of Phase One was to establish the date to which the M & M lien claims related back, which would have fixed the respective priorities of the various lien claimants against the Refinery assets. Assuming the court decided that Glitsch was not entitled to priority in Phase One, Phase Two would have involved issues concerning Glitsch's right to "removables" from the Refinery Assets. After the court had taken the matters introduced in Phase One under advisement, the parties announced that they had settled the controversy.

**6.** The agreed deficiency between Glitsch's stipulated claim amount ($2,851,195.43) and the settlement amount paid by the Term Lenders ($2,509,051.80). Glitsch has received full payment on this deficiency claim, as all of the allowed unsecured claims have been paid in full by the trustee.

**7.** We will refer to this as the Glitsch Subordinated Claim.

the extent of any excess collateral value).[8] Perhaps because of the nature of this "third claim"—the Glitsch Subordinated Claim—a claim only authorized by virtue of the compromise (*i.e.*, a claim which, as a matter of law, could otherwise never be allowable against the bankruptcy estate), one significant aspect of the agreement was that the Glitsch Subordinated Claim would be subordinated to the allowed claims of ordinary unsecured creditors.[9] The precise subordination language, now the subject of this dispute, is as follows:

> [The Glitsch Subordinated Claim is] to be subordinated in payment to the general unsecured claims in such estate, and no distributions shall be made on such claim until all general unsecured claims receive the full amount of distributions provided under applicable law.

At the time this settlement was made, few anticipated that unsecured creditors would be paid more than a fraction of their claims. Now, however, some six years later, the Chapter 7 Trustee has been able to generate enough money (and to settle many senior claims) to pay all remaining allowed unsecured claims in full. To everyone's delight, the trustee still has another $1 million to distribute. Unfortunately, in order to make that distribution, the trustee needs to know just what the above-quoted language regarding the Glitsch Subordinated claim means.

In the "garden-variety" chapter 7 bankruptcy case, if money remains after the payment of unsecured claims, then an additional distribution is made to unsecured creditors pursuant to section 726(a)(5), which states that

> Except as provided in section 510 of this title, property of the estate shall be distributed—.. (5) fifth, in payment of interest at the legal rate from the date of filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection ...

11 U.S.C. § 726(a)(5). There is nothing "garden variety" about this particular bankruptcy case, however, as its long history, unique disputes, and plethora of published decisions attest. The issue causing distribution confusion for the trustee here is quite simple (at least in its statement). Where does the Glitsch Subordinated Claim fit—*before* the section 726(a)(5) distribution, or *after* it?[10]

---

8. *See*, 11 U.S.C. § 503(b). Glitsch, of course, was deemed to be undersecured by virtue of the settlement (*i.e.*, its claim exceeded the value of the collateral securing the claim).

9. Actually, the Glitsch Compromise Order does not contain the subordination language. Instead, the Glitsch Compromise Order incorporates *by reference* the Joint Motion for Authority to Compromise the Controversy which also includes as an exhibit the proposed Agreed Judgment.

   The Agreed Judgment among the parties provides in part:

   > ORDERED that Glitsch shall have, and does hereby receive, an allowed unsecured claim in Case No. 94–30051–C (Chapter 7), In re El Paso Refinery, L.P., pending in the United States Bankruptcy Court for the Western District of Texas, El Paso Division, in the amount of $933,624.38, to be subordinated in payment to the general unsecured claims in such estate, and no distributions shall be made on such claim until all general unsecured claims receive the full amount of distributions provided under applicable law.

10. "After" in this case would place the Glitsch Subordinated Claim ahead of the statute's subsection (6) distribution, *i.e.*, "the debtor." *See* 11 U.S.C. § 726(a)(6). As this debtor is a master limited partnership, this class would (perhaps) consist of the holders of master limited partnership units—though that issue too is far from free from doubt. Fortunately, the question is not yet before the court, and hopefully the trustee will finally run out of money to distribute before having to resolve the issue.

The Joint Motion for Authority to Compromise the Controversy provides in part:

> Glitsch shall also have an allowed claim in the El Paso Refinery, L.P. bankruptcy for its contractual interest and attorneys' fees incurred in the prosecution of its claim, but such claim for interest and attorneys' fees shall be subordinated in full to the complete payment of all other general unsecured claims in the bankruptcy case of El Paso Refinery, L.P., and no distributions will be made on such claim until all general unsecured claims receive the full amount of distributions provided under applicable law.

The General Unsecureds, of course, believe that the Trustee should distribute the available funds to payment of post-petition interest on their claims before paying Glitsch's allowed unsecured subordinated claim. Glitsch believes that it is entitled to full payment of its subordinated claim prior to any payment of interest to the General Unsecureds. Both support their views with readings of section 726(a)(5) (and cases construing that section, including published opinions out of this court), and their interpretations of the language in the Glitsch Compromise Order. The Trustee, caught in the middle, filed pleadings to obtain guidance from the court. On July 29, 1999 (nearly five years after the settlement), the Trustee filed (1) a Motion for Clarification of the Glitsch Compromise Order and (2) a Motion for Authority to Make Additional Interim Distributions. The matters were set for hearing, at which the court entertained extensive oral argument from both sides. At the conclusion of the hearing, the court ruled from the bench, agreeing with the position urged by Glitsch and directing the Trustee to make distribution first to Glitsch's subordinated claim. On November 1, 1999, the court memorialized its bench ruling in a written Order (the "Distribution Order").

■■■ On November 12, 1999, the General Unsecureds timely[11] filed a Motion for Reconsideration of the Distribution Order. In this new Motion, the General Unsecureds pointed out something that

had been glossed over at the original hearing; Glitsch's allowed unsecured unsubordinated claim was for attorneys fees and interest—and Glitsch is not an oversecured creditor. *See* 11 U.S.C. § 506(b). The General Unsecureds perhaps should have argued these points at the original hearing, but the court deemed it more important to attempt to reach the right conclusion, and exercised its discretion to entertain further oral argument to flesh out this aspect of the issue.[12] That hearing was conducted on December 15, 1999. This memorandum constitutes the court's decision on the Motion for Reconsideration. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A).

## II. DISCUSSION

### A. THE COURT'S BASIS FOR THE BENCH RULING AND PRIOR ORDER

In our original bench ruling, we held that the statutory scheme of § 726(a) entitles Glitsch to payment of its subordinated claim before payment of post-petition interest to the General Unsecureds under § 726(a)(5).

We started our analysis with the language of the Glitsch Compromise Order. The Glitsch Compromise Order provides in pertinent part:

Glitsch shall also have an allowed claim in the El Paso Refinery, L.P. bankruptcy for its contractual interest and attor-

---

11. November 11, 1999 (the tenth day after entry of the Distribution Order), was Veteran's Day, a Federal holiday. Accordingly, the Motion for Reconsideration was timely filed under Fed.R.Bankr.P. 9006(a).

12. The Federal Rules of Civil Procedure do not provide for a "Motion for Reconsideration" but such motions may properly be treated as either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment. *See Kelley v. Price–Macemon, Inc.,* 992 F.2d 1408 (5th Cir.1993). A Motion for Reconsideration is essentially a motion under Rule 9023 of the Federal Rules of Bankruptcy Procedure, incorporating Rule 59(e) of the Federal Rules of Civil Procedure,

when the motion is filed within ten (10) days of the judgment. *See Id., Forsythe v. Saudi Arabian Airlines Corp.,* 885 F.2d 285, 289 (5th Cir.1989). *See also* 10 COLLIER ON BANKRUPTCY, ¶ 9023.04 at 9023–6 (15th ed. 1999) ("Any motion that draws into question the correctness of the judgment is functionally a motion under Rule 9023...."). The purpose of a motion for reconsideration is to correct or amend errors of law or fact or to present newly discovered evidence. In their Motion for Reconsideration the General Unsecureds reassert an argument that the court admittedly overlooked in the initial hearing, that is, the dispositive effect of the express language of the Glitsch Compromise Order.

neys' fees incurred in the prosecution of its claim, but such claim for interest and attorneys' fees shall be subordinated in full to the complete payment of all other general unsecured claims in the bankruptcy case of El Paso Refinery, L.P., and no distributions will be made on such claim until all general unsecured claims receive the full amount of distributions provided under applicable law.

The court was of the opinion that Glitsch's subordinated claim was essentially a garden variety general unsecured claim that was subordinated only to other unsecured claims.[13] Operating off that assumption, the court then focused on the application of the distribution scheme in section 726. The court's ultimate conclusion turned out to be incorrect, due primarily to its misinterpretation of the language of the Glitsch Compromise Order. The court's analysis of the operation of section 726 was accurate, however, and affects the ultimate resolution of the matter. We accordingly reproduce that analysis here.

▇▇▇ The distribution scheme under section 726 is the contemplated last step in the overall liquidation process of a Chapter 7 case. The distribution process does not begin until all property has been converted to cash and all secured claims have been satisfied. *See e.g. In re Laymon,* 117 B.R. 856, 859–860 (Bankr.W.D.Tex.1990), *rev'd on other grounds, Bradford v. Crozier (In re Laymon* ), 958 F.2d 72 (5th Cir.1992).[14]

Section 726 establishes the order in which claims are paid. First, priority claims specified in section 507 must be satisfied. If any funds still remain after complete satisfaction of this first tier of claims, then timely allowed unsecured claims are paid next. If these claims are fully satisfied and monies are still left, then tardy unsecured claims can be paid next. After these claims are paid in full, and if money still remains, then claims attributable to fines, penalties, or forfeitures, or for exemplary, punitive or multiple damages to the extent such claims are not in compensation for actual pecuniary loss, are next paid. If these claims are fully satisfied and money still remains, then the fifth distribution level kicks in, permitting "payment of interest at the legal rate from the date of the filing of the petition" on any of the claims paid in the previously described distribution scheme. Finally, if money still remains, the trustee turns over that balance to the debtor. *See* 11 U.S.C. § 726(a)(1)–(6).

▇▇▇ The appropriate placement of the Glitsch Subordinated Claim turns in part on a correct understanding of the operation and purpose of section 726(a)(5). In a nutshell, if the payment of interest pursuant to § 726(a)(5) is a distribution of a piece of creditors' prepetition unsecured claims, then the Glitsch Subordinated Claim should be subordinated to the section 726(a)(5) distribution as well. This is so because the Glitsch Compromise Order language subordinated the Glitsch Subordinated Claim to "the general unsecured claims in such estate."

To arrive at a correct understanding of section 726(a)(5), we first examine its overall role in the bankruptcy process. Section 726 describes the distribution order a trustee is to follow when it comes time to pass out the money. It does not purport to address the allowance or categorization of claims. Other sections of the Code, such as section 502, accomplish that task.[15]

---

13. For the reasons stated later in this memorandum, we now recognize that this was an error.

14. The precise question presented in *Laymon* was the appropriate rate of interest for oversecured claims allowed under section 506(b). The Fifth Circuit reversed this court's ruling on that issue. However, the Fifth Circuit left untouched this court's rather extensive analysis of section 726(a)(5), which constituted a part of the court's analytical basis for its ultimate conclusion that the federal judgment rate should be used for section 506(b) as well. The court is comfortable that the Fifth Circuit has, to date, expressed no view on the appropriate rate of interest to be employed in section 726(a)(5), and that that portion of *Laymon* thus remains good law.

The section 726 distribution scheme *does* split up, for distribution, some *kinds* of claims. For example, personal injury claims may be "general unsecured claims" under section 502, but for distribution purposes, these claims are broken down into at least two component parts—the part that compensates for actual damages suffered and the part that is designated as punitive or exemplary damages. The one part is paid with other unsecured creditors. The other part is not paid unless there is enough money left over to get to that lower distribution level. In the same way, one could argue that the post-petition interest payable at the fifth distribution level in section 726 is really payment of a portion of general unsecured creditors' claims—being that part of claim that unsecured creditors would have been able to collect from the debtor if there had not been a time delay and an automatic stay imposed by the bankruptcy process. Is the post-petition interest in section 726(a)(5) part of unsecured creditors' allowed claims, much as the punitive damages in section 726(a)(4) is part of unsecured tort creditors' allowed claims? Or is it something else?

■ We concluded at the original hearing that it is "something else," and we ratify that conclusion here.[16] The court relied on its reasoning in *Laymon:*

> The justification for interest [under § 726(a)(5)], if it is to be paid at all, is in compensation for the detention of money occasioned by the bankruptcy case itself, a detention visited equally on all credi-

tors of the bankruptcy estate by a process operating under the exclusive auspices of the federal judicial system, and a detention not directly related to the prepetition agreements the debtor struck with its creditors. The obligation is the bankruptcy estate's, not the debtor's.... [u]nder Section 726(a)(5), if a Chapter 7 estate ultimately proves to be solvent, all holders of allowed unsecured claims are paid interest on their claims before any proceeds of the liquidation are returned to the debtor.

*In re Laymon,* 117 B.R. 856, 859–860 (Bankr.W.D.Tex.1990), *rev'd on other grounds, Bradford v. Crozier (In re Laymon),* 958 F.2d 72 (5th Cir.1992). *Laymon,* 117 B.R. at 859. The payment of interest pursuant to § 726(a)(5) is a distinct entitlement that is a creature of equity. Because it is a creature of equity, a payment of interest under 726(a)(5) is separate and distinct from the claim on which it is paid. *Accord In re Frontier Properties, Inc.,* 979 F.2d 1358, 1366–1367 (9th Cir.1992) ("Thus § 726(a)(5) provides for payment of post-petition interest on all claims only as a last priority before the distribution of surplus to the debtor."); *In re Riverside–Linden Investment Co.,* 945 F.2d 320, 323 (9th Cir.1991) ("when all claims against a Chapter 7 debtor have been paid, the surplus in the estate, if any, is to be paid out as interest to the claimants."); *In re West Marketing Corp.,* 155 B.R. 399, 404 (Bankr.N.D.Tex.1993) ("any obligation to pay postpetition interest on general unsecured claims is not fixed until the bankruptcy estate pays in full the principal amount of all allowed claims in full.")

15. We learn in section 502 what constitutes a "deemed allowed" claim against a bankruptcy estate. Section 506 tells us when such a claim will be treated as a "secured claim." Section 503 tells us about certain post-petition claims attributable in most instances to work done for the estate. Section 507 tells us that certain kinds of claims ought to be paid ahead of other claims (tax claims are the most familiar example). Section 726 uses the phrase "allowed unsecured claims" without

defining the phrase because it does not need to. The constellation of provisions in Chapter 5 of the Code do that.

16. At the original hearing, that legal conclusion allowed the court to conclude that the Glitsch Subordinated Claim should be paid ahead of the section 726(a)(5) distribution. Although the legal conclusion was accurate, the holding with regard to the Glitsch Subordinated Claim was flawed because of a misreading of the Glitsch Compromise Order. We

(citations omitted). Indeed, the clearest indicator that the section 726(a)(5) distribution has a source independent of allowed unsecured claims is found in section 502 itself. That section expressly *excludes* from the category of "allowable claim" any post-petition interest on prepetition unsecured claims. 11 U.S.C. § 502(b)(2). Whatever monies are being paid to unsecured creditors by virtue of section 726(a)(5), it is not by virtue of any prepetition entitlement. *Laymon*, 117 B.R., at 860. This interest distribution is not "part of" general unsecured claims *qua* claims.

■ So why *does* the Bankruptcy Code award post-petition interest to creditors who are otherwise expressly prohibited from charging interest to the estate as part of their allowed claims? The answer is elegantly simple: it would be unfair to give any excess funds in a bankruptcy case back to the debtor whose filing caused creditors to suffer delay in the satisfaction of their claims, without first compensating those creditors for that delay. The equitable distribution made by virtue of section 726(a)(5) is designed to prevent debtors from receiving an unfair windfall, at the expense of their creditors. *In re Continental Airlines Corp.*, 110 B.R. 276, 280 (Bankr.S.D.Tex.1989) ("Where the debtor is solvent and there is a surplus after all creditors are paid in full, the creditors should receive interest on their claims prior to any surplus being turned over to the Debtor."); *see Laymon*, 117 B.R., at 861 (citing Supreme Court authorities and legislative history).

The court at the original hearing concluded after this analysis that, because the interest distributed under section 726(a)(5) is separate and distinct from creditors' unsecured claims, Glitsch's subordinated claim should be paid before that distribution was made. The court focused on that portion of the Glitsch Compromise Order referring to subordination "to the general unsecured claims in such estate," and noted that, as a result of its interpretation, the interest distribution made under section 726(a)(5) was not part of "the general unsecured claims" described in the Order.[17]

**B. ON MOTION FOR RECONSIDERATION . . .**

On November 12, 1999, the General Unsecureds filed a Motion for Reconsideration of the Order Granting Trustee's Motion to Make Additional Interim Distributions to Glitsch Field Services, Inc., challenging the foregoing conclusion. In the motion, the General Unsecureds point out that the Glitsch Subordinated Claim was, in fact, *not* what would otherwise qualify as an ordinary unsecured claim.

---

discuss that issue *infra* in the next section of this opinion.

17. Further support for the court's conclusion was found in *Laymon's* analysis of the appropriate rate to use for computing section 726(a)(5) interest. The rate settled on, the federal judgment rate, was selected because it most accurately represented the function of section 726(a)(5)—compensation for the estate's detention of monies due to unsecured creditors:

[The use of the federal judgment rate] . . . comport[s] with two . . . general principles . . . ratable distribution and use of federal law to decide a federal issue. In addition, the federal judgment rate matches the analytical posture of claims *vis-a-vis* the federal bankruptcy. Upon bankruptcy, all claims against the estate are "deemed allowed" as of the filing . . . From and after the petition date, creditors hold the equivalent of a fed-

eral judgment against estate assets, enforceable only in federal court. . . .

*Laymon*, 117 B.R., at 862. For what it is worth, the court's ruling on this point laid the ground work for similar holdings by other courts, including most recently, a decision by Judge Art Spector in a comparatively high-profile bankruptcy, Dow Corning Corporation. *See In re Dow Corning Corp.*, 237 B.R. 380 (Bankr.E.D.Mich.1999); *see also In re Godsey*, 134 B.R. 865 (Bankr.M.D.Tenn.1991); *accord, In re Beguelin*, 220 B.R. 94 (9th Cir. BAP 1998); *In re Gaines*, 178 B.R. 101 (Bankr.W.D.Va.1995); *In re David Green Property Mgmt.*, 164 B.R. 92 (Bankr.W.D.Mo. 1994); *In re Chiapetta*, 159 B.R. 152 (Bankr. E.D.Pa.1993); *Wasserman v. City of Cambridge*, 151 B.R. 4 (D.Mass.1993); *but see In re Adcom, Inc.*, 89 B.R. 2 (D.Mass.1988); *Federal Savings & Loan Corp. v. Moneymaker (In re A & L Properties)*, 96 B.R. 287 (C.D.Cal. 1988); *In re Carter*, 220 B.R. 411 (Bankr. D.N.M.1998); *In re Huang*, 192 B.R. 184 (Bankr.N.D.Ill.1996);

To the contrary, the Glitsch Subordinated Claim would not even qualify as an allowable claim against any bankruptcy estate (because undersecured creditors may not recover post-petition interest or attorneys fees on pre-petition claims). The General Unsecured creditors note that the nature of this claim was not apparent when the Glitsch Compromise was first noticed to creditors, perhaps explaining why unsecured creditors failed to object at that time. In addition, the General Unsecureds suggest that the court may have erred as a matter of law in its interpretation of the Glitsch Compromise Order. Applying known principles of contract construction, they say, leads to a conclusion quite the opposite of the one reached by the court. Thus, while the General Unsecureds do not dispute the court's interpretation of section 726(a)(5), they *do* challenge the court's reading of the Compromise Order. If the court follows the rules of contract interpretation suggested by the General Unsecureds, and then applies its interpretation of section 726(a)(5), it will conclude that the Glitsch Subordinated Claim can only be paid *after*, not before, the interest distribution due to unsecured creditors by virtue of section 726(a)(5).

■■■ We start by recognizing that any agreed order compromising a dispute is, by its nature, a consent decree. A consent decree is an agreement made by parties to a case, following negotiation and compromise, for the purpose of avoiding costly and protracted litigation. *Alberti v. Klevenhagen*, 46 F.3d 1347, 1364 (5th Cir. 1995); *Walker v. United States*, 912 F.2d 819, 825 (5th Cir.1990). Consent decrees are construed under rules of contract construction. *See Walker v. United States*, 912 F.2d 819, 825 (5th Cir.1990); *In re General Homes Corp.*, 134 B.R. 853, 864 (Bankr.S.D.Tex.1991); *In re Bettis*, 97 B.R. 344, 347 (Bankr.W.D.Tex.1989). Federal courts look to state law to provide the rules for contract interpretation. *Clardy Mfg. Co. v. Marine Midland Business*

*Loans, Inc.*, 88 F.3d 347, 352 (5th Cir. 1996), *cert. denied*, 519 U.S. 1078, 117 S.Ct. 740, 136 L.Ed.2d 679 (1997); *Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc.)*, 12 F.3d 426, 443 (5th Cir.1994).

■■■ Under Texas law, a court must enforce the unambiguous language of a contract as written. The applicable standard is the "objective intent" evidenced by the language used, rather than the subjective intentions of the parties. *Clardy*, 88 F.3d at 352; *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981). A contract is unambiguous if it can be given a definite or certain meaning as a matter of law. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). When a contract is not ambiguous, extrinsic evidence may not be admitted for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. *Clardy*, 88 F.3d at 352; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). On the other hand, a contract is ambiguous if after applying the rules of construction the contract is subject to two or more reasonable interpretations. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). However, an ambiguity does not arise merely because the parties advance conflicting interpretations of the contract. *Columbia Gas*, 940 S.W.2d at 589. Instead, for an ambiguity to exist, the interpretation asserted by each party must be reasonable. *Id.* The language of a document must be accorded its plain, ordinary and generally accepted meaning unless it definitely appears the intention of the parties would thereby be defeated. *E.g., Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex.1987). Similarly, courts are prohibited from construing a writing in a manner that would require insertion of a qualifying word or phrase if such a construction would alter the ordinary meaning of the writing. *Praeger v. Wilson*, 721 S.W.2d 597, 601 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.).

■ Applying these rules of construction to the Glitsch Compromise Order, we find the Glitsch Compromise Order is indeed unambiguous. Its meaning can be gleaned from the language within the four corners of the documents that make up the Compromise. It remains only to apply the rules of contract construction to the language of the Glitsch Compromise Order in order to see whether the parties intended to subordinate the Glitsch Subordinated Claim not only to general unsecured claims (as the court earlier found) but also to the section 726(a)(5) interest distribution.

The court believes that a correct application of rules of contract construction does indeed mean that the General Unsecureds are right. This is the court's conclusion for several reasons.

■ First, when construing a contract, a court must "harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Chapman v. Orange Rice Mill. Co.,* 747 F.2d 981, 983 (5th Cir.1984) (applying Texas law). Said another way, a court "cannot disregard as surplusage the succeeding provisions of a contract; it must give effect to all." *D.E.W., Inc. v. Local 93, Laborers' Int'l Union,* 957 F.2d 196, 200 (5th Cir.1992); *see also Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). The Glitsch Compromise Motion says that Glitsch's subordinated claim "shall be *subordinated in full to the complete payment of all other general unsecured claims* in the bankruptcy case of El Paso Refinery, L.P., *and* no distributions will be made on such claim until all general unsecured claims *receive the full amount of distributions provided under applicable law."*

The phrase *"full payment under applicable law"* must mean something more than the mere satisfaction of the general unsecured claims already covered under section 726(a)(2), because the first part of the sentence (the part before the "and") *already* subordinates the Glitsch Subordinated Claim to the "complete payment of all other general unsecured claims." To avoid rendering this second phrase redundant (if possible), we must look to see if there is some other reasonable referent for it—and there is, of course.

The complete phrase "until all general unsecured claims receive the full amount of distributions under applicable law" easily has a content distinct from the satisfaction of claims under section 726(a)(2); those same claims are entitled to an additional *distribution* under *applicable law* (*i.e.,* bankruptcy law) by virtue of section 726(a)(5). Note the statutory language: "payment of interest from the date of filing ... on *any claim paid* under paragraph ... (2) ... of this subsection." 11 U.S.C. § 726(a)(5). Applicable law contemplates a distribution *on any claim* falling within the ambit of subparagraph (2) distributions—and those are general unsecured claims. Thus, we can invest meaning in the separate phrase, preventing a redundancy, when we read it to refer to the distribution to be made to unsecured creditors pursuant to section 726(a)(5).[18]

At the hearing, the court asked Glitsch counsel to explain to what he thought this second half of the phrase might be referring, if not to section 726(a)(5). Counsel at first suggested that it was simply there for emphasis, and merely repeated the thrust of the first half of the phrase, but retreat-

---

18. This reading is also consistent with our analysis in the previous section of how best to understand section 726(a)(5). We said there that the interest permitted to be paid there has a genesis independent of the unsecured claims upon which it is paid. Thus, full payment of unsecured claims would not perforce encompass payment of section 726(a)(5) interest. Here too, the language of the Glitsch Compromise Order contemplates full payment of two discrete claim entitlements—full distribution under section 726(a)(2) and full distribution under section 726(a)(5), the first governed by the first part of the sentence, the second governed by the second half of the sentence. For somewhat different reasons, we end up agreeing with the General Unsecureds that the language of the Compromise Order imposes *two* conditions precedent on payment of the Glitsch Subordinated Claim, consisting of satisfaction of these two distribution entitlements.

ed from that position upon realizing that long-accepted rules of contract construction would not permit that reading. He then suggested that perhaps the language was intended to refer to the payout from the $7 million fund created under the Term Sheet as part of the price paid by the Term Lenders for their being able to foreclose on the refinery earlier in the case.[19] Although the suggestion is not without credence, the court believes that the language employed by the parties will not accommodate that interpretation. The second half of the phrase, again, says that "no distributions shall be made on such claim until all general unsecured claims receive the full amount of distributions provided *under applicable law.*" At the point in time when the parties reached their settlement, the Term Sheet had been in effect for well over a year, and the fund was well known to all the parties to the settlement (recall that one of the settling parties was the Term Lenders). The phrase "under applicable law" is a poor choice of words indeed for referring to this fund—one would have expected counsel of the skill and competence of the lawyers who negotiated and drafted the Compromise Agreement to have used terminology referring to the $7 million fund as provid-

ed in the Term Sheet if that is what they had in mind. After all, it was not "applicable law" which created that fund, but yet another agreement among parties in the bankruptcy case. Applicable law would not have created such a fund—only the agreement of the parties could have done that. By the same token, "applicable law" is a nice choice of words for sweeping up section 726(a)(5) (along with such other reservoirs of rights that might be available at law to unsecured creditors in the bankruptcy case). The court declines to accept Glitsch's proffered explanation for the meaning of the second half of the relevant phrase in the Glitsch Compromise Order.

Second, the very nature of the Glitsch Subordinated Claim lends further credence to the view that the parties intended that unsecured creditors would receive every possible distribution to which the law might entitle them before the Subordinated Claim would be paid anything at all. We need to recall that the Subordinated Claim is no typical, garden variety unsecured claim.[20] Glitsch's subordinated claim was a creation of the parties to the settlement, as a compromise of litigation.[21] In fact, but for the subordinated claim arrangement in the Compromise Order,

19. The Term Sheet was a creation of the Term Lenders, the Unsecured Creditors Committee, and the Examiner (and their respective counsel), and included a variety of provisions that have offered numerous litigation opportunities to parties and the court for the balance of this estate's administration. The particular provision to which reference is here made created a fund for the benefit of unsecured creditors, to give them some assurance of a recovery at a point in time in the case when few believed there would even be enough left over to pay administrative claims. As it turned out, the combination of this fund and the recoveries realized by the Chapter 7 Trustee in this case yielded sufficient funds to pay all remaining allowed unsecured claims to be paid in full.

20. This was another oversight in our original ruling. We did not examine how and why the Glitsch Subordinated claim was created. If this had been a garden variety subordinated claim, then our prior ruling and analysis would have been correct (i.e. subordinated

claims are usually paid prior to interest under § 726(a)(5)).

21. In fact, the claim against the estate would not exist absent the agreement. At the time the Compromise was entered into by the parties, the estate was in no danger of having to pay anything to Glitsch because the litigation involved two competing creditors fighting over lien rights against collateral that was not likely to yield any excess value to unsecured creditors. By the settlement, the respective lien creditors decided to settle the interest and attorneys fees aspect of Glitsch's claim by relegating it to payment out of another pot entirely—the bankruptcy estate's general assets. That meant that, as a result of the settlement, Glitsch would be a competitor with other unsecured creditors for the limited assets of the estate. The trustee, on behalf of those creditors, insisted that at least the attorneys fees and interest aspect of Glitsch's claim be subordinated to the claims of other unsecured creditors.

Glitsch's claim for interest and attorneys' fees would have gone a' begging because it would not otherwise have been an allowed claim at all under the Bankruptcy Code. 11 U.S.C. § 506(b) (allowing payment of interest and attorneys' fees on *oversecured* claims secured by property of the estate). Because the claim was created by agreement, the entire section 726(a) distribution scheme is not directly implicated. Section 726(a) *does* expressly recognize the validity and enforceability of subordination agreements "as provided in section 510" and that section in turn states that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable unonbankruptcy law." 11 U.S.C. § 510(a). Here, we have a subordination agreement which is enforceable at law and qualifies under section 510.

The nature of the Glitsch Subordinated Claim supports the conclusion that the parties (including those parties who elected not to object to the Motion to Compromise) understood the subordination to be a deep one indeed, one that was supposed to place an otherwise nonallowable claim behind all entitlements of ordinary unsecured creditors. Another piece of the Glitsch claim, the deficiency claim, was *not* subordinated, but was instead placed into the unsecured creditor pool, notwithstanding the fact that, as a result, it would dilute the recovery for other unsecured creditors. Notwithstanding that dilution, the character of that claim was such that few could challenge the propriety of placing that claim in with other creditors. The same, of course, could not be said for the claim that ended up being the Glitsch Subordinated Claim. Thus, the circumstances surrounding the settlement lend further credence to our interpretation of the relevant phrase in the Compromise Order.

Because the court finds that the Glitsch Compromise Order is unambiguous, the rules of construction require the court to enforce the Order as it is written. Any other reading would violate the plain, ordinary meaning of the language in the Glitsch Compromise Order and would contravene the rules of statutory construction. Accordingly, the General Unsecureds are entitled to payment of statutory interest under section 726(a)(5) prior to any payment on Glitsch's subordinated claim.

### III. CONCLUSION

Based on the foregoing, the court finds that the General Unsecureds' Motion for Reconsideration is meritorious and should be granted. Accordingly, the November 1, 1999, Order Granting Trustee's Motion to Make Additional Distributions to Glitsch Field Services, Inc. is hereby vacated. The Glitsch Subordinated Claim is here held to be subordinate to the distribution for which provision is made in section 726(a)(5). The Trustee shall distribute funds remaining in the estate to creditors and parties in interest in accordance with these findings.

So ORDERED.