IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-11049
_____


HARRY PTASYNSKI; WL GRAY & CO,

                    Plaintiffs-Appellees-Cross-Appellants,

        versus

SHELL WESTERN E&P INC, ET AL,

                    Defendants,

SHELL WESTERN E&P INC; SHELL OIL COMPANY; MOBIL OIL CORP,

                    Defendants-Appellants-Cross-Appellees.


_____

Appeals from the United States District Court
for the Northern District of Texas
_____

February 13, 2002

Before GARWOOD, PARKER, and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:[*]

    Defendants-appellants-cross-appellees Shell Western E&P Inc., Shell

Oil Co. (collectively "Shell") and Mobil Oil Corp. ("Mobil") appeal the

_____

[*]Pursuant to 5TH CIR. R.47.5 the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

district court's judgment for plaintiffs-appellees-cross-appellants Harry Ptasynski (Ptasynski) and W.L. Gray & Co. ("Gray") as to their negligent misrepresentation and declaratory judgment claims. Ptasynski and Gray appeal the district court's finding for defendants as to their contract and negligence per se claims and also complain that the award of prejudgment interest to them should have been based on Colorado law. We affirm in part and reverse in part.

**Facts and Proceedings Below**

In the 1970s, due to the rising costs of oil, petroleum companies began to investigate the use of carbon dioxide to increase oil output from older fields. They discovered that when carbon dioxide is injected under sufficient pressure into an older field ($CO_2$ flooding), it mixes with oil underground, dislodging it from the surrounding rock and enhancing its recovery. This process is known as tertiary or enhanced oil recovery (EOR). Oil fields in West Texas were considered prime candidates for EOR.

The largest carbon dioxide field capable of supplying these West Texas fields was the McElmo Dome area, located in Montezuma and Dolores counties, Colorado. As of 1981, the McElmo Dome area was divided into seven small units. Together, Shell and Mobil Producing Texas & New Mexico Inc. (MPTN), a Mobil subsidiary, owned 87% of the total working interest in the McElmo Dome area. Shell and Mobil believed that the abundant carbon dioxide reserves of the McElmo Dome area could be harvested more efficiently if the area was operated as a single unit.

2

Throughout 1982, Shell and Mobil took steps to realize their vision for the McElmo Dome area. A partnership called Cortez Pipeline Co. was formed to construct, own and operate a 500 mile pipeline that would carry carbon dioxide from McElmo Dome to fields in West Texas.[1] Shell also entered into a contract with the Denver Unit in West Texas for the sale of a large volume of carbon dioxide.[2]

Finally, Shell filed an application with the Colorado Oil & Gas Commission to operate the McElmo Dome area as a single unit. MPTN supported this application. The Commission held public hearings on Shell's application on October 18-19, 1982. At the conclusion of these hearings, the Commission preliminarily approved Shell's application, but required Shell to obtain the consent of 80% of the cost-bearing working interest owners and 80% of the non-cost bearing royalty interest owners. Because Shell and MPTN collectively owned 87% of the total working interest, the first requirement was instantly satisfied. Prior to the hearing, Shell had obtained the preliminary approval of the United States Minerals Management Service (MMS), which owned 76% of the total royalty interest. Thus, Shell had only to obtain consent of an addition 4% of the total royalty interest in order to secure final approval from

---

[1]Shell Cortez Pipeline Co., a Shell subsidiary, was a 50% partner in the Cortez Pipeline Co. Mobil Cortez Pipeline Co., a Mobil subsidiary, was a 37% partner.

[2]The price of the carbon dioxide under the Denver Unit contract was $.90 per thousand cubic feet (mcf), but the contract provided this price would fluctuate according to the price of oil. In addition, the contract required the Denver Unit operator to also reimburse Shell for the cost of transporting the carbon dioxide from McElmo Dome to West Texas.

the Commission.

In order to obtain such consent, Shell, on January 6, 1983, sent a package of materials to the royalty interest owners. The package included: 1) a brochure entitled "A Program for Unit Operations," which was designed to provide an overview of the project; 2) the Unit Agreement for the proposed McElmo Dome Unit; and 3) a ratification form by which the royalty interest owners could manifest their assent to the Unit Agreement. The brochure contained, *inter alia*, information in the form of questions and answers. Among these were the following:

> "**What is the price for $CO_2$?**
>
> The sales price provided in the contract with the Denver Unit is 90¢ per thousand cubic feet as of 12/1/81. This price will fluctuate up or down based on the price of West Texas crude. Based on December, 1982 oil prices, the sales price is about 85¢ per thousand cubic feet.
>
> **Will the royalty owners of interest in this unit have to pay for the pipeline, transportation or injection of $CO_2$ in West Texas?**
>
> No."

Harry Ptasynski and Wilfred L. Gray[3] are independent geologists with over forty years of experience in the oil and gas industry. In the 1960s and 1970s, both acquired leases in the McElmo Dome area—Ptasynski from the federal government and Gray from the federal government and the state of Colorado. Each assigned his lease to others but retained an overriding royalty interest. Each received Shell's package and signed

---

[3]Wilfred L. Gray later transferred his interests in the leases to W.L. Gray & Co., a partnership owned by Wilfred L. Gray and his wife. W.L. Gray & Co. is the named plaintiff.

and returned the ratification form. Together, Ptasynski and Gray own about 0.05% of the total royalty interest in McElmo Dome. Ultimately, Shell obtained the consent of 92.5% of the total royalty interest. As a result, the McElmo Dome Unit became effective on April 1, 1983, and production of carbon dioxide began in December 1983. Ptasynski and Gray have been receiving royalties from this production since 1984. Such royalties were based on the carbon dioxide's value before being transported to West Texas. Defendants generally determined this value by in effect subtracting the cost of transportation from the delivered sales price. Plaintiffs claim they were not aware of this until fellow royalty interest owner George Bailey filed his own lawsuit on March 11, 1997.

Plaintiffs filed their complaint on May 21, 1997. The gravamen of the complaint is that, contrary to the representation in the brochure, plaintiffs were, in effect, charged for transporting the carbon dioxide to West Texas. The complaint alleges that defendants are liable for: 1) willfully filed fraudulent tax documents in violation of 26 U.S.C. § 7434; 2) fraud; 3) fraudulent concealment; 4) negligent misrepresentation; 5) civil conspiracy; 6) breach of contract; and 7) negligence per se. The complaint also sought a judicial declaration that, *inter alia*, "as to all future production from the Unit, [defendants] shall not be permitted to deduct any transportation costs from the royalty payments made to plaintiffs."

Originally, the complaint named only the Shell defendants. Mobil

5

and Cortez Pipeline Co. were added in February 1998, but the latter was dismissed without prejudice in September 1998. Eventually, the parties filed cross-motions for summary judgment. The net result was that plaintiffs' claim under 26 U.S.C. § 7434 and their attempt to assert a substantive claim for fraudulent concealment were dismissed with prejudice.[4] All other claims were bench tried on August 2, 3 and 9, 1999. The district court found for defendants on the fraud, civil conspiracy, contract and negligence per se claims and for plaintiffs on the negligent misrepresentation and declaratory judgment claims. The district court ordered Shell to pay Ptasynski $202,910.61 and Gray $329,029.02, and Mobil to pay Ptasynski $118,409.[5]

The defendants appeal the district court's judgment for plaintiffs as to their negligent misrepresentation and declaratory judgment claims. The plaintiffs appeal the district court's finding for defendants as to their contract and negligence per se claims and complain that it improperly applied Texas, instead of Colorado, law in awarding prejudgment interest.

**Discussion**

I.   Standard of Review

---

[4]The district court correctly observed that, in Texas, fraudulent concealment in this context is not an independent cause of action. Rather it serves to estop a defendant from relying upon the defense of limitations until the plaintiff discovers or could by reasonable diligence have discovered the defendant's fraud. *See Computer Associates International v. Altai*, 918 S.W.2d 453, 456 (Tex. 1996). *See also Rozell v. Kaye*, 197 F.Supp. 733, 735 (S.D. Tex. 1961).

[5]Gray has not asserted any claims against Mobil.

6

Only the claims disposed of in the bench trial are at issue in this appeal. "The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Kona Technology Corp. v. Southern Pacific Transportation Co.*, 225 F.3d 595, 601 (5th Cir. 2000).

II. Negligent Misrepresentation

A. Discovery Rule

The alleged negligent misrepresentation (distribution of the brochure) occurred in January 1983, over fourteen years before the plaintiffs filed their original complaint. The statute of limitations for negligent misrepresentation claims is two years. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998). The district court found that Texas's discovery rule applies to claims of negligent misrepresentation and that, because plaintiffs did not learn how the defendants were computing their royalties until they became aware of the Bailey lawsuit in 1997, the discovery rule saved plaintiffs' negligent misrepresentation claim.

It is uncertain whether Texas's discovery rule applies to negligent misrepresentation claims. In *Kansa Reinsurance Co. v. Congressional Mortgage Corp. of Texas*, 20 F.3d 1362, 1372 (5th Cir. 1994), this Court held that Texas law precludes application of the discovery rule to claims of negligent misrepresentation. Since *Kansa* was decided, the Texas Supreme Court has adopted a categorical approach to application of the discovery rule, but has not clarified whether the rule applies

7

to a claim of negligent misrepresentation. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998). The test is whether the nature of the injury renders it inherently undiscoverable *and* objectively verifiable. *Id*. At least one Texas court of appeals has held that the discovery rule can apply to a negligent misrepresentation claim , *Matthiessen v. Schaefer*, 27 S.W.3d 25, 31 (Tex. App. 2000), while another acknowledges that that question has not been settled, *Davis v. Minnesota Life Insurance Co.*, 2000 WL 795887 *4 n.3 (Tex. App.-Austin, 2000) (unpublished). The district court did not acknowledge any of this authority or discuss why it believed the Texas Supreme Court would apply the discovery rule to claims of negligent misrepresentation.

However, even if the discovery rule applies to negligent misrepresentation claims, accrual of the cause of action is only delayed until the plaintiff knew, or in the exercise of reasonable diligence should have known, of the facts giving rise thereto. *HECI*, 982 S.W.2d at 886. As mentioned, the district court stated that the plaintiffs did not actually discover how their royalties were calculated until 1997. The district court did not address whether the plaintiffs, in the exercise of reasonable diligence, should have discovered the facts giving rise to their claims any earlier. However, remand for such a finding is not necessary where, as will be shown here, the record demonstrates that plaintiffs' negligent misrepresentation claim is without merit. Some of the facts that show the claim's lack of merit also indicate that the plaintiffs should have known how their royalties

8

were computed years before 1997.  We also note that under the Texas Supreme Court's recent decision in *Wagner & Brown Ltd. v. Horwood*, 585 S.W.3d 372 (Tex. 2001), it is highly doubtful that plaintiffs' injury was inherently undiscoverable as required for the discovery rule to be applicable.

B.    Merits

The elements of negligent misrepresentation are: 1) representation made by defendant in the course of his business or in a transaction in which he has a pecuniary interest; 2) the defendant supplies false information regarding an existing fact for the guidance of others in their business; 3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and 4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).  Defendants assert that the district court's conclusion that the second and fourth elements were satisfied was clearly erroneous.

1.    False Information

Defendants contend that the question and answer alleged to be false was, in fact, true.  The question and answer at issue amounts to a representation that, under the proposed Unit Agreement, the royalty interest owners would not have to pay for three things: 1) construction of the pipeline; 2) transportation of carbon dioxide to West Texas; and 3) the use of the carbon dioxide to enhance oil recovery in West Texas.

9

The district court held that by deducting "transportation costs prior to calculating royalty interest payments [defendants were] in effect requiring the plaintiffs to pay for the transportation cost."

We begin by offering the following illustration. Suppose the plant tailgate value of carbon dioxide is $1.00 per unit, the cost of transporting it to the buyer $.50, the downstream price $1.50 and the overriding royalty interest 10%.[6] The royalties based on the tailgate and downstream values are $.10 and $.15, respectively. The plaintiffs' share of the cost of transportation is $.05. The royalty the defendants paid to the plaintiffs corresponds to the $.10 figure in this example.

The defendants contend that, in calculating plaintiffs' royalty, they have not charged plaintiffs for their share of transportation costs. Instead, they claim that the proper point for valuation of plaintiffs' overriding royalty interests is the tailgate, and that it is proper to arrive at the tailgate value by subtracting the total cost of transportation from the downstream value. This is known as the "net-back" method, and it is not uncommon for working interest owners to employ it exactly as the defendants did.

The plaintiffs maintain, and the district court found, that they

_____

[6]The tailgate value of the carbon dioxide corresponds to its value at the tailgate of the McElmo Dome Unit plant, after it has been gathered from the wellhead and processed, but before it has been transported to the buyer. The downstream price reflects the increased value of the delivered carbon dioxide. Assuming the price of transportation is reasonable, the downstream price should be approximately equal to the sum of the tailgate price and the cost of transport.

10

*were* charged for their share of transportation costs. As is clear from our example, the net-back method yields the same royalty (10% x ($1.50 - $.50) = $.10) as basing the royalty upon the downstream price or value (10% x $1.50 = $.15) then charging the plaintiffs for their share of transportation costs (10% x $.50 = $.05).

Thus, there is merit in the plaintiffs' contention, and the district court's finding, that the plaintiffs were charged for transportation. However, it is questionable whether a reasonable overriding royalty interest owner would have understood the brochure to promise a greater royalty than the plaintiffs here received. Several factors place in doubt the reasonableness of plaintiffs' interpretation of the brochure. As discussed in greater detail in Part II.B.2, *infra*, these factors also render unjustified any reliance upon plaintiffs' interpretation.

Section 14 of the Unit Agreement stated that it did not change how working interest owners settle for royalty interests and that such settlements would be in accord with existing contracts, laws and regulations. The leases between the plaintiffs and defendants are silent as to how post-production costs are to be allocated. The plaintiffs are unable to point to any authority that establishes that working interest owners cannot share the cost of transportation of marketable gas with non-working interest owners.[7]

---

[7]Not surprisingly, when the Colorado Supreme Court later addressed the issue of cost allocation in *Garman v. Conoco, Inc.*, 886 P.2d 652 (Colo. 1994), it held that working interest owners must bear the entire

In addition, the brochure provided that under the Denver Unit contract, the only contract for the sale of McElmo Dome Carbon dioxide that Shell had negotiated at the time the plaintiffs were asked to approve the formation of the Unit, the price of carbon dioxide was $.90 and would fluctuate according to the price of oil. As noted above, the very next statement in the brochure asserted that plaintiffs would not be charged for the cost of transportation of the carbon dioxide to West Texas. Together, these representations imply that the plaintiffs were to be paid a royalty based on the sales price of $.90 with no charges for transportation deducted therefrom. Plaintiffs were, in fact, paid

cost of making the resource marketable but, absent agreement to the contrary, they may share certain value-enhancing costs with the non-working interest. Transportation was specifically mentioned as such a value-enhancing cost that may be shared. *Id.* at 661.

The Colorado Supreme Court's recent decision in *Rogers v. Westerman Farm Company,* 29 P.3d 887 (Col. 2001), does not point in a different direction in the present context. There the Colorado Supreme Court stated that "the determination of whether transportation costs (either short or long distance) are to be allocated between the parties is based on whether the gas is marketable before or after the transportation costs are incurred", *id.* at 900, and "[o]nce a determination is made that gas is marketable, costs can be allocated accordingly. Costs incurred to make the gas marketable are to be borne solely by the lessees. Alternatively, costs incurred subsequent to the gas being marketable are to be shared proportionately between the lessee and the lessors." *Id.* at 912-13. Here, the district court clearly determined that the gas was marketable *before* the 500 mile transportation to Texas. In its June 16, 1999 summary judgment opinion the court stated "[t]he parties in this case are not arguing over the costs of making the carbon dioxide gas marketable but over the costs of moving the marketable gas from Colorado to Texas"; and in its oral ruling at the conclusion of the bench trial the court "incorporate[d] the Court's memorandum opinion filed June 16, 1999 in which the cross motions for summary judgment were granted in part and denied in part. The background facts are as stated in that memorandum opinion." Plaintiffs in this appeal have not challenged the district court's determination that the gas was marketable at the tailgate of the McElmo Dome Unit plant.

12

a royalty based on the $.90 price (which had decreased to $.79, in accordance with the stated formula relating the $.90 price to changes in the price of oil, by the time plaintiffs' received their first royalty payment). The Denver Unit contract provided that the buyer would, in addition to the $.90 figure referenced in the brochure, pay Shell for the cost of transporting the carbon dioxide through the pipeline. Thus, the $.90 figure quoted in the brochure was net of any charge for transportation.

The representation concerning transportation charges is best understood as clarifying that the $.90 figure is the one upon which royalties would be based. Plaintiffs' interpretation of the brochure produces the absurd result that they are entitled to a windfall, i.e. royalty based on the downstream price without being charged for transportation if Shell sells the carbon dioxide after being transported, but not if Shell structures the deal so that the buyer takes possession of the carbon dioxide before it is transported.

The misrepresentation question is not entirely free from doubt because, *when read in isolation*, the complained-of section of the brochure could be viewed as telling plaintiffs they would not be charged for transportation, and, as we have explained, the plaintiffs were charged for transportation. But because we find, in Part II.B.2, *infra*, that the district court's conclusion regarding the justifiable reliance element was clearly erroneous, we do not need to decide whether the brochure contained a misrepresentation. Accordingly, for purposes of

13

evaluating the propriety of the district court's ultimate conclusion that the defendants were liable to plaintiffs for the tort of negligent misrepresentation, we will assume, without deciding, that the brochure did contain a misrepresentation.

    2.    Justifiable Reliance

        a.    *Actual* Reliance

The essence of plaintiffs' negligent misrepresentation claim is that the statement in the brochure about transportation costs induced them to approve the Unit Agreement.  In such a case, the necessary element of reliance[8] requires plaintiffs to prove that but for the presence of this statement in the brochure they would not have approved the Unit Agreement-i.e., that if the brochure had not contained that statement they would not have approved the Unit Agreement.  *See, e.g., Clardy Mfg. Co. v. Marine Midland Business Loans*, 88 F.3d 347, 359 (5th Cir. 1996);[9] *Haralson v. E.F. Hutton Group*, 919 F.2d 1014, 1030 (5th

---

[8]We have referred to the "justifiable reliance" requirement as being "also called the 'materiality' element" of a negligent misrepresentation claim. *Geosearch, Inc. v. Howell Petroleum Corp.,* 819 F.2d 521, 526 (5th Cir. 1987). *See also McCamish, Martin, Brown & Leoffler v. F.E. Appling,* 991 S.W.2d 787, 794 (Tex. 1999) (negligent misrepresentation claim requires that "a claimant justifiably rely on a . . . representation of material fact").

[9]In *Clardy* we held there was no evidence to justify trial on a negligent misrepresentation claim, stating:

>  ". . . no reasonable trier of fact would believe that John Clardy, Jr., *in fact* relied on Norvet's representations regarding the loan approval process.  In other words, no reasonable trier of fact would conclude that Clardy Manufacturing . . . would not have entered into the letter agreement if Marine had made explicit the fact that final

Cir. 1990) (". . . the test for materiality is 'whether the contract would have been signed by the plaintiff without such representation having been made'", quoting *Adickes v. Andreoli*, 600 S.W.2d 939, 946 (Tex. Civ. App. 1980)). Because in this bench trial testimony plaintiffs, when interrogated about the matter, declined to state that they would not have approved the Unit Agreement, and the other evidence does not support such a conclusion but rather suggests the contrary, the trial court's finding that plaintiffs relied on the brochure statement is either clearly erroneous or based on an erroneous view of what plaintiffs must establish to satisfy the reliance element of this negligent misrepresentation claim.

(i) Ptasynski

At trial, Ptasynski testified that the question and answer in the brochure did not cause him to believe that by entering into the Unit Agreement, he would receive any "better deal" as to how his royalties were calculated. Ptasynski also testified that there were several reasons he entered into the Unit Agreement, among them that in an undivided unit (like the proposed McElmo Dome Unit) the life of the leases in the unit is extended for the life of the unit and that he was glad to be a part of such an ambitious project. The following exchange occurred during cross-examination at trial:

---

credit approval had to come from outside of Dallas. Clardy Manufacturing can therefore not show that the representation was "material" to its decision to enter into the agreement." *Id*. (footnotes omitted).

15

Q. (By Mr. Aronowitz) All right, sir. You didn't think, when you got this unit agreement and brochure and letter, that you were going to be given a better deal on your – on how royalties would be calculated under your override, did you?

A. (Mr. Ptasynski) A better deal?

Q. Right.

A. No, I certainly did not.

Q. You ratified for the reasons we talked about.

A. Among others, right.

Q. All right. And we can go through but they're in the brochure and you've already talked about them. And that's what you perceived to be the consideration you were to receive for ratifying the unit agreement, right?

A. Participation of the unit, yes.

Q. Okay. So you would have ratified the unit agreement even if that question and answer, "Will the royalty owners of interest in this unit have to pay for the pipeline, transportation or injection of $CO_2$ in West Texas," even if that question and answer hadn't been there you would have ratified this unit agreement, wouldn't you?

A. *I'm not sure.* I'm not sure of that because, like I said, this is a different kind of unit, totally different kind of unit. If you had stated in the brochure that there's a contract price and then there's a transportation cost and we're not going to tell you what the transportation costs are, I may not have signed it. I may have sold my interest or got a bunch of the royalty owners together and said, hey, we don't have to sign this. This is a bad deal. I could have done that. *I don't know.*

Q. Well, at least we know that you didn't ratify the unit agreement because you thought the brochure enlarged your rights under the overriding royalty interest you held, right?

16

A.   Had enlarged?

Q.   That's right.

A.   No, I never expected to have them enlarged. I expected to be paid what I'm supposed to be paid and what – in the manner that the bureau [sic] – that the brochure states, no charge for transportation cost.

Q.   That question and answer – I just want to make sure I have your testimony precise on this. "Will the royalty owners of interest in this unit have to pay for the pipeline, transportation or injection of CO2 in West Texas?" Answer, "No."

A.   Right.

Q.   That question and answer did not change any existing belief you had, when you received the brochure, concerning the basis upon which you thought you were entitled to be paid royalty, correct?

A.   It didn't change anything because I expected to be paid my 3 and a half percent of the proceeds without any deduction for transportation costs.  (emphasis added)

This testimony was not retracted or modified. Given that the Ptasynski was unable to testify that, absent the alleged misrepresentation, he would not have ratified the Unit Agreement, the district court's finding that the reliance element was satisfied as to plaintiff Ptasynski was clearly erroneous.

(ii)   Gray

Gray, like Ptasynski, testified on cross-examination that prior to receiving the brochure he believed his royalty interests entitled him to be paid royalties on the downstream price of carbon dioxide without being charged for transportation. During Gray's cross-examination, the following exchange took place:

17

Q.  (By Mr. Aronowitz) I just want to make it clear.  Try it again.  You already believed that transportation would not be deducted before you got the brochure?

A.  (By Mr. Gray) That's correct.

Q.  Okay.  And you didn't rely on anything Shell told you in the brochure that you didn't already believe at the time that you executed the ratification and consent of the McElmo Dome Unit agreement.

A.  When I looked at it I said, by golly, that's right.  Even they say so.  You're right.  I didn't – it just reaffirmed what I already thought was probably true.

Q.  So you would have ratified the unit agreement even if that question and answer about transportation hadn't been in there, correct?

A.  Depend on whether or not you put the statement in there we're going to take transportation charges out and it may be – you may get little or nothing than I may not have signed it.  If you had been truthful and said we are taking them out, then I might not have signed it.  But you're saying if you just left it out completely?

Q.  Take it out.

A.  Take it out.  I wonder.  Maybe.  *I don't know*.  This is 15 years ago.  I might wonder why they left that statement out with all the things that they're saying, you won't be paying for this and you won't be paying for that.  (emphasis added)

Again, this testimony as not modified or retracted.  Gray also testified that, after figuring the royalties he would receive based on the brochure's description of the Denver Unit contract, he believed the Unit Agreement was a "good deal".  It is undisputed that the brochure's representations concerning the Denver Unit contract, upon which Gray based his conclusion that the Unit Agreement was a "good deal", were truthful: the royalty on the sales under the Denver Unit contract was

18

paid upon the therein stated price, as represented in the brochure, without any deduction from that price for transportation costs.[10]  As with Ptasynski, the trial evidence does not support a finding that, but-for the alleged misrepresentation, Gray would not have ratified the Unit Agreement.

Accordingly, the district court's finding that the reliance element of plaintiffs' negligent misrepresentation claim was satisfied was clearly erroneous.

    b.  *Justifiable* Reliance

"Texas law requires that a plaintiff claiming negligent misrepresentation prove that its reliance was justifiable. . . . the reliance must be reasonable." *Scottish Heritable Trust v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir. 1996).  Accord *Clardy*, 88 F.3d at 358.[11]  Where the evidence does not support a finding that the plaintiff's reliance was justified and reasonable, this court, and the Texas courts, have not hesitated to hold that the defendant was entitled to judgment as a matter of law on the negligent. misrepresentation claim.  *See, e.g., Scottish Heritable Trust*, 81 F.3d at 615 ("We

---

[10]The $.90 price quoted in the brochure was the price as of December 1981.  By the time of the October 1982 hearing, the price had fallen to $.85, and by the time of the first royalty payment it had further decreased to $.79, all pursuant to the stated formula calling for it to be adjusted in accordance with fluctuations in the price of oil.

[11]*See also, e.g., American Tobacco Co. Inc. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997) ("negligent misrepresentation claims require reasonable reliance on the representation"); *Faciolla v. Linbeck Const. Corp.*, 968 S.W.2d 435, 442 (Tex. App.–Texarkana 1998; n.w.h.).

19

therefore hold as matter of law that if SHT did indeed rely on Peat Marwick's audit reports with respect to its stock purchases following the initial acquisition, such reliance was simply unjustified"); *Clardy*, 88 F.3d at 358-59 ("When viewed against all of the surrounding circumstances and the plaintiff's business experience, Clardy Manufacturing's reliance on Norvet's representation was, as a matter of law, unjustified"); *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 142 (Tex. App.-Houston (14th Dist.) 1999; writ denied) ("Holt's reliance was not reasonable or justified as a matter of law"); *Bluebonnet Sav. V. Grayridge Apt. Homes*, 907 S.W.2d 904, 909 (Tex. App.-Houston (1st Dist.) 1995; writ denied) ("no evidence of justifiable reliance by a reasonable business person . . . A reasonable business person, especially one with Mr. Harvey's experience . . . would not reasonably rely on it"); *Airborne Freight v. C.R. Lee Enterprises*, 847 S.W.2d 289, 297 (Tex. App.-El Paso 1992; writ denied) ("we find that Lee could not have *justifiably* believed that Airborne would continue to employ the delivery service. . ."). Finally, "[t]he justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience." *Scottish Heritable Trust*, 81 F.3d at 614; *Clardy*, 88 F.3d at 358 (same). *See also Bluebonnet Sav.*, 907 S.W.2d at 909. Ptasynski and Gray each had over forty years' experience in the oil and gas business. To the extent that plaintiffs may have relied on the alleged misrepresentation, such reliance was, as a matter of law, not justified.

First, in the October 1982 hearing before the Commission (of which

20

plaintiffs were given notice), Shell clearly stated that nothing in the Unit Agreement would alter existing royalty arrangements between overriding royalty interest owners and working interest owners, that working interest owners would be responsible for paying royalties in accordance with their leases or assignments from the overriding royalty interest owners, and that the Unit Agreement did not contain any provision as to how the carbon dioxide would be valued. Section 14 of the Unit Agreement plainly states that "[s]ettlement for Royalty Interest not taken in kind shall be made by Working Interest Owners responsible therefor under existing contracts, laws and regulations". The message from Shell was clearly that the Unit Agreement did not provide any information concerning any of these issues. Plaintiffs' reliance on the brochure for any information as to the substance of those arrangements was unjustified. Under these circumstances, it was, as a matter of law, unreasonable for two experienced oil men such as plaintiffs to rely on the statement in the brochure as meaning anything more than that royalty on sales under the Denver Unit contract would be calculated on the basis of that contract's $.90 per m.c.f. price (as adjusted for fluctuations in the price of oil) without deduction from the $.90 figure for transportation (or other) costs.

A basic understanding of the Denver Unit contract is incompatible with justifiable reliance by plaintiffs upon the alleged misrepresentation. Plaintiffs contend that they are entitled to royalties based on the proceeds of Shell's sale of carbon dioxide and

21

that when Shell sells downstream but uses the net back method to calculate royalty, it is wrongfully charging plaintiffs for transportation in contravention of the brochure. At the time the Unit Agreement was approved, the Denver Unit contract was Shell's only downstream contract for the sale of McElmo Dome Unit carbon dioxide. The brochure accurately stated the base price for carbon dioxide, which was $.90, and that this price would fluctuate with the price of crude oil. At the October 1982 hearing, Shell stated that the Denver Unit operator was paying Cortez Pipeline Co. $.50 per mcf to transport the carbon dioxide from McElmo Dome to the Denver Unit. Section 4.2 of the Denver Unit contract clearly states that tariff reimbursement is in addition to the $.90 per mcf price for the carbon dioxide. Thus, the $.90 per mcf price that the brochure referred to and which rendered the Unit Agreement a "good deal" (in the words of plaintiff Gray), represented the McElmo Dome Unit plant *tailgate* value of carbon dioxide under the Denver Unit contract. As the gas was marketable at that point, that $.90 per m.c.f. tailgate value was the appropriate basis on which to calculate royalty under the leases and assignments giving rise to plaintiffs' overriding royalty.

Section 5.1 of the Denver Unit contract provides that "the point at which title to the carbon dioxide delivered hereunder shall pass from Seller to Buyer, shall be the flange or weld connecting the facilities of Cortez Pipeline Company with the facilities of Buyer, and such point is herein called the 'Delivery Point'." Under the "good deal" Denver

22

Unit contract, Shell was selling downstream and, in ultimate economic effect, calculating royalty via the net-back method. Plaintiffs were, by their own standards, being charged for their share of transportation under the Denver Unit contract.

Shell, as it stated it would at the hearing and in the brochure, thereafter continued to seek other buyers for McElmo Dome Unit carbon dioxide. Some of these contracts are structured differently than the original Denver Unit contract. In these contracts, the only price mentioned represents the *downstream* value of carbon dioxide. The harm of which plaintiffs complain is Shell's deduction of that part of the downstream value that constitutes the cost of transportation before plaintiffs' royalties are calculated. However, provided the amount deducted for transportation is reasonable, plaintiffs remain in exactly the same position they enjoyed under the "good deal" that was the Denver Unit contract.

Any reliance by plaintiffs on the brochure for an arrangement more favorable than the "good deal" Denver Unit contract was as a matter of law unjustified.

### 3. Causation

Even if plaintiffs had justifiably relied on the brochure in ratifying the Unit Agreement, it is undisputed that all that was required for the Unit Agreement to go into full effect was approval of Shell and Mobil and 80% of the total royalty interest, that Shell had already received consent of 76% of the royalty interest when the

23

brochure was sent out and ultimately secured consent of 92.5% of the royalty interest, and that plaintiffs, combined, possessed less than 0.05% of the royalty interest. First, neither Ptasynski nor Gray testified at trial that he would have been motivated to oppose the Unit Agreement if the brochure had been *silent* as to transportation costs. Second, even if we assumed they would have used best efforts to cause other royalty owners to reject the Unit Agreement, plaintiffs have not even alleged, much less presented any evidence, that they would, or even could, have succeeded in preventing 80% royalty interest approval. Absent a credible allegation and showing that plaintiffs' opposition to the Unit Agreement would have prevented the harm of which they now complain, the misrepresentation is not actionable.

In sum, even if the transportation cost statement in the brochure is construed to constitute a misrepresentation, we find that the district court's conclusion that plaintiffs suffered pecuniary loss by justifiably relying thereon is clearly erroneous.[12]

III. Breach of Contract

The district court applied the four year period of limitations contained in TEX. BUS. & CON. CODE ANN. § 2.725(a) to plaintiffs' breach

---

[12]Accordingly, we need not and do not reach defendants' arguments that: 1) benefit of the bargain damages were inappropriate; 2) the damage award included damages owed not by Shell or Mobil, but by Santa Fe; 3) the declaratory judgment order was impermissibly vague; and 4) Mobil was not responsible for the content of the brochure.

24

of contract claim.[13]  Section 2.275(b) provides that the cause of action accrues when the breach occurs.  Here, the alleged breach occurred more than 13 years before plaintiffs brought this action.  The district court also held that the discovery rule did not apply to this claim and, therefore, it was barred by limitations.  Plaintiffs argue that the district court should have applied TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(c), which provides that in certain actions therein described the cause of action does not accrue until "the day the dealings in which the parties were interested together cease."[14]

---

[13]TEX. BUS. & COM. CODE ANN. § 2.725 provides:
§ 2.725. Statute of Limitations in Contracts for Sale
(a) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.  By the original agreement the parties may reduce the period of limitations to not less than one year but may not extend it.
(b) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
(c) Where an action commenced within the time limited by Subsection (a) is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.
(d) This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this title becomes effective.

[14]TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 provides:
§ 16.004. Four-Year Limitations Period
(a) A person must bring suit on the following actions not later than four years after the day the cause of action accrues:
    (1) specific performance of a contract for the conveyance of real property;
    (2) Penalty or damages on the penal clause of a bond to convey real property;

Plaintiffs do not urge that the district court erred by failing to allow them recovery for the royalties allegedly underpaid during the four years just prior to filing suit, but rather appear to take an "all or nothing" position, namely that under section 16,004(c) limitations *never* ran so long as royalty was being paid. Even aside from the fact that plaintiffs did not urge section 16.004(c) in the district court, it is plain that this position is without merit. Under Texas law, "the statute [of limitations] begins to run on money due as royalty under a written contract when such money is due and payable." *Foster v. Atlantic Refining Company*, 329 F.2d 485, 490 (5th Cir. 1964) (under-payment of royalty claim). That means that for limitations purposes "claims for unpaid royalty 'accrued' monthly as oil and gas are produced and the agreed royalty is not paid." *Harrison v. Bass Enterprises Production Co*., 888 S.W.2d 532, 537 (Tex. App.-Corpus Christi 1994; n.w.h.). *See also, e.g., Humble Oil & Refining Co. v. Fanthson*, 268 S.W.2d 239, 244 (Tex. Civ. App.-Galveston 1934; writ ref'd) ("The four-

---

(3) debt;
(4) fraud;
(5) breach of fiduciary duty.
(b) A person must bring suit on the bond of an executor, administrator, or guardian not later than four years after the day of the death, resignation, removal, or discharge of the executor, administrator, or guardian.
(c) A person must bring suit against his partner for a settlement of partnership accounts, and must bring an action on an open or stated account, or on a mutual and current account concerning the trade of merchandise between merchants or their agents or factors, not later than four years after the day that the cause of action accrues. For purposes of this subsection, the cause of action accrues on the day that the dealings in which the parties were interested together cease.

year statute of limitations applies insofar as appellees were seeking to recover payments due them under the mineral lease more than four years prior to the filing of their action"). These authorities are necessarily inconsistent with application of section 16.004(c) (formerly Tex. Rev. Civ. Stats. Art. 5527 sec. 3) under the terms of which limitations commence to run when, but only when, "the dealing in which the parties were interested together cease." We know of no decision by any court that has ever applied section 16.004(c) (or its said predecessor) to a mineral lessor's action for royalty, and we decline to do so. Indeed, Texas courts have rejected the application of section 16.004(c)'s predecessor, Tex. Rev. Civ. Stats. Art. 5527 sec. 3, to share of production claims under circumstances arguably much closer to those covered by that statute than the claims here are. *See, e.g., Luling Oil & Gas Co. v. Humble Oil & Refining Co.*, 191 S.W.2d 716, 720-21 (Tex. 1946) (claims by one lessee against another who operated property not governed by art. 5527 sec. 3 which "will only apply . . . to the class or classes of persons clearly coming within its terms, and only in causes of action named in the statute"); *Shell Oil Company v. State*, 442 S.W.2d 457, 459 (Tex. Civ. App.-Houston [14th] 1969; n.r.e.) (lessor's royalty claim can't avoid normal four year statute by calling it "an accounting for profits"). *See also Dvorken v. Lone Star Industries*, 740 S.W.2d 565, 566 (Tex. App.-Fort Worth 1987; n.w.h.) ("Under Texas law, actions for the recovery of royalty payments. . . are subject to the general four-year statute of limitations . . . Tex. Civ.

27

Pract. & Rem. Code sec. 16.051 (Vernon 1986)"). We decline to hold that section 16.004(c) is applicable.

In any event, it is clear that plaintiffs have no breach of contract claim. As the district court stated in its bench trial ruling, the breach of contract claim "is founded upon the brochure and the testimony." As previously observed, the Unit Agreement expressly and unambiguously provided that it did not change how working interest owners settle for royalty interests and such settlements would be governed by and in accordance with existing contracts, laws and regulations. Because, as the district court found, the gas was marketable before being transported from Colorado to Texas, the royalty interests bear their proportionate share of the cost of that transportation. See note 7 above. The brochure does not purport to either be contractual or to alter the Unit Agreement or the existing contracts which governed royalty settlement, and it is at most representational. Neither Ptasynski nor Gray testified that they considered the brochure to be contractual, and, as discussed above (see part II B 2), each testified that they did not understand it to alter how their royalty would be calculated or enlarge their royalty rights. Moreover, as previously noted, neither was able to testify that had the brochure not contained the challenged statement they would not have approved the Unit Agreement. For the same reasons (see part II B 2) that the record does not support a finding of justifiable reliance by either Ptasynski or Gray on the challenged statement in the brochure,

28

it likewise does not support a finding that that statement created any contractual right, not provided for in the instruments under which they hold their royalty interests, to have their royalty calculated without proportionately bearing the cost of transportation of the marketable gas from Colorado to Texas.[15]

IV. Negligence Per Se

Paragraph 46 of the complaint alleges that, by failing to provide information required by TEX. NAT. RES. CODE § 91.502, defendants committed negligence per se and are liable to plaintiffs therefor.[16] The district

---

[15]With respect to promissory estoppel, even if it were otherwise available, which is highly doubtful since the relevant computation of royalty is governed by the contracts or leases under which plaintiffs hold their royalty interest as expressly and unambiguously provided in the Unit Agreement, it would be inapplicable because (as demonstrated in part II B 2) the record does not support a finding of justifiable reliance by plaintiffs. *See Clardy*, 88 F.3d at 360-61 (where evidence would not support finding of justifiable reliance, no promissory estoppel recovery available); *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141-42 (Tex. App.-Houston [14th] 1999; writ denied) (jury verdict for plaintiff on promissory estoppel set aside where "reliance was not reasonable or justified as a matter of law". *See also Zenor v. El Paso Healthcare System, Ltd,* 176 F.3d 847, 865 (5th Cir. 1999).

[16]TEX. NAT. RES. CODE § 91.502 provides:
§ 91.502. Types of Information Provides.
Each check stub or attachment to a payment form must include:
(1) the lease, property, or well name or any lease, property, or well identification number used to identify the lease, property, or well;
(2) the month and year during which the sales occurred for which payment is being made;
(3) the total number of barrels of oil or the total amount of gas sold;
(4) the price per barrel or per MCF of oil or gas sold;
(5) the total amount of state severance and other production taxes paid;
(6) the windfall profit tax paid on the owner's interest;
(7) any other deductions or adjustments;
(8) the net value of total sales after deductions;
(9) the owner's interest in sales from the lease, property, or well expressed as a decimal;

29

court concluded that Texas law provides no private enforcement mechanism for violations of section 91.502.  In their briefs to this Court, plaintiffs reassert their section 91.502 argument and contend, for the first time, that defendants' failure to disclose exactly how plaintiffs' royalties were calculated violates COLO. REV. STAT. § 34-60-118.5(2.3) and defendants' fiduciary duty to plaintiffs.[17]

The complaint does not allege that defendants breached a fiduciary duty to plaintiffs or that defendants violated COLO. REV. STAT. § 34-60-

---

(10) the owner's share of the total value of sales before any tax deductions;
(11) the owner's share of the sales value less deductions; and
(12) an address at which additional information may be obtained and questions may be answered.

[17] COLO. REV. STAT. § 34-60-118.5(2.3) provides:
(2.3) Notwithstanding any other applicable terms or arrangements, every payment of proceeds derived from the sale of oil, gas, or associated products shall be accompanied by information that includes, at a minimum:
(a) A name, number, or combination of name and number that identifies the lease, property, unit, or well or wells for which payment is being made;
(b) The month and year during which the sale occurred for which payment is being made;
(c) The total quantity of product sold attributable to such payment, including the units of measurement for the sale of such product;
(d) The price received per unit of measurement, which shall be the price per barrel in the case of oil and the price per thousand cubic feet ("MCF") or per million British therman units ("MMBTU") in the case of gas;
(e) The total amount of severance taxes and any other production taxes or levies applied to the sale;
(f) The Payee's interest in the sale, expressed as a decimal and calculated to at least the sixth decimal place;
(g) The payee's share of the sale before any deductions or adjustments made by the payor or identified with the payment;
(h) The payee's share of the sale after any deductions or adjustments made by the payor or identified with the payment;
(i) An address and telephone number from which additional information may be obtained and questions answered.

118.5(2.3). Neither argument appears to have been presented to the district court. Accordingly, this Court cannot consider them. *See Diaz v. Collins*, 114 F.3d 69, 71 n.5 (5th Cir. 1997). However, we note the following: 1) COLO. REV. STAT. § 34-60-118.5(2.3) was not enacted until July 1, 1998; 2) the Colorado Supreme Court has held that there is no private right of action under the Oil and Gas Conservation Act (see *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 919 (Colo. 1997)); 3) neither Colorado or Texas law recognizes a fiduciary relationship between royalty interest and working interest owners (see *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998) and *Garman v. Conoco, Inc.*, 886 P.2d 652, 659 n.23 (Colo. 1994)); and 4) the Tenth Circuit has suggested that the Colorado Supreme Court would probably not impose a fiduciary duty upon unit operators (*Atlantic Ritchfield v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1162 n. 12 (10th Cir. 2000)).

At oral argument, plaintiffs opined, for the first time, that Shell owed plaintiffs a fiduciary duty because the Unit Agreement constituted a joint venture under Colorado law. Plaintiffs rely heavily upon *Dime Box Petroleum Corp. v. Louisiana Land and Exploration Co.*, 938 F.2d 1144, 1147 (10th Cir. 1991), which found than an operating agreement satisfied Colorado's three-part test for the existence of a joint venture. The elements are: 1) a joint interest in property; 2) an express or implied agreement to share in the losses or profits of the venture; and 3) conduct showing cooperation in the venture. *Id.* (quoting *Agland, Inc. v. Koch Truck Line, Inc.*, 757 P.2d 1138 (Colo. Ct.

31

App. 1975)).  While Shell and the plaintiffs do have a joint interest in the carbon dioxide until Shell sells it, the Unit Agreement does not provide that profits and losses are shared.  Whether Shell extracts the carbon dioxide for free or for triple the amount it could be sold for, Shell still owes plaintiffs the same royalty.  Profits and losses are not shared.

As to the district court's conclusion that there is no private right of action for violation of TEX. NAT. RES. CODE § 91.502, plaintiffs' only response is a citation to *Lively v. Carpet Services*, 904 S.W.2d 868, 871 (Tex. Ct. App. 1995), which states that the absence of a specific statutory provision authorizing private enforcement is not necessarily fatal to maintenance of an action for negligence per se.  Plaintiffs make no attempt to argue that, considering the factors set forth by the Texas Supreme Court in *Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998), violation of section 91.502 constitutes negligence per se.  The two most relevant factors are: 1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies the standard of conduct for an existing common law duty; and 2) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.  *Id*. at 309.  Both of these factors seem to militate against viewing violation of section 91.502 as negligence per se.  However, as plaintiffs have not even attempted to argue the relevant Texas law on this point, their position can be rejected without further analysis.  Moreover, plaintiffs have cited no authority to indicate that

32

section 91.502 is applicable to royalty payments made to nonresidents of Texas on the basis of instruments executed outside of Texas and in respect to mineral production in Colorado.

V.    Fraud

The district court in its bench trial findings rejected plaintiffs' claims of fraud and fraudulent concealment, finding that neither was supported by the evidence.[18]  Plaintiffs fail to address the district court's finding that no facts were adduced at trial to support their claims in this respect.  Plaintiffs do not allege the district court committed any legal errors or argue that its findings of fact were clearly erroneous.  No error is presented as to any of these matters.

---

[18]The court found:

"There has been no evidence during trial that would establish that the defendants were reckless with their choice of language in the brochure or that they intended for the plaintiffs to interpret the brochure language to their detriment in the matter claimed in the fraud count. They have also failed to establish the third and fourth elements of the fraud claim, that's made with the intent that the plaintiff would rely on that claim and also made knowing false or recklessly made. So I would find for the defendant on the fraud claim."

It also found:
"the Court does specifically find that the plaintiffs failed to introduce any evidence at trial which established either that the defendants knew that they were negligently misrepresenting their method of calculating royalty payments or failing to disclose, as required by Texas law; or, that the – secondly, that they used deception to conceal either of these torts.  Accordingly, the defense of fraudulent concealment does not prevent the running of the applicable Statute of Limitations periods."

33

## Conclusion

Even if the district court was correct that the brochure contained a misrepresentation, it is clear that the plaintiffs did not rely thereupon. To the extent that they may have relied on the brochure, such reliance was not justified. And even if such reliance would have been justified, it did not cause the harm of which plaintiffs now complain. As explained, the district court's express and implied findings to the contrary were clearly erroneous. The judgment for plaintiffs on the negligent misrepresentation and declaratory judgment claims is reversed. The plaintiffs' cross-appeal concerning prejudgment interest is moot. Finally, we affirm the dismissal of all of plaintiffs' remaining claims, including their breach of contract, negligence per se and fraud claims.

AFFIRMED in part, REVERSED in part.